[No. S124003. July 28, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ROY LOPEZ GARCIA, Defendant and Appellant.

## Counsel

Riordan & Horgan, Dennis P. Riordan, Donald M. Horgan and Dylan L. Schaffer for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Laurence K. Sullivan, Eric D. Share and John H. Deist, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GEORGE, C. J.**—It has been established under California law for more than a century that when a trial court authorizes a jury to view the scene of an alleged crime during a criminal trial, the defendant and his or her counsel have a right to be present during the jury view. (*People v. Bush* (1886) 68 Cal. 623, 631–634 [10 P. 169].) The issue presented by this case is whether, when a jury has visited the crime scene during the presentation of evidence at trial and, after jury deliberations have begun, requests and is permitted to revisit the crime scene, the defendant and his or her counsel similarly have the right to be present at the jury's return visit to the crime scene.

The trial court in this case ruled that defendant and his counsel have no such right and authorized the jury to revisit the crime scene while barring defendant and his counsel from being present during the return visit. The Court of Appeal, in a two-to-one decision, upheld the trial court's ruling. In reaching its conclusion, the majority in the Court of Appeal analogized a jury's revisit to the crime scene to a jury's reexamination of an exhibit in the jury room during deliberations, at which a defendant and defense counsel have no right to be present. The dissenting justice in the Court of Appeal disagreed with the majority's analogy, finding that a jury's revisit to a crime scene differs significantly from its examination of an item of physical evidence in the jury room, because there is a substantially greater risk that a return visit to a crime scene will result in the jury's receipt of new or improper evidence. Because of this risk, the dissenting justice considered it essential that defendant and his or her counsel have the right "to be present to observe what occurs on the scene, to ascertain for themselves whether new

evidence has been taken (or has simply emerged), and to witness the occurrence of any irregularities." We granted review to consider the issue.

As we shall explain, we agree with the dissenting Court of Appeal justice, the Honorable Maria P. Rivera, that when a trial court permits a jury to revisit a crime scene after the jury has begun deliberations, the defendant and his or her counsel have the right to be present and observe what occurs during the jury revisit. As discussed, *post*, not only does a return visit to a crime scene during jury deliberations create a substantially greater risk that the jury will be exposed to new or improper evidence than when the jury is permitted to examine a trial exhibit in the jury deliberation room, but even when a jury during deliberations requests to examine a trial exhibit or exhibits, the defendant and his or her counsel have the right, under the governing California statute, to be present when the court identifies what exhibit or exhibits are to be given to the jury, in order to ensure that the jury is not exposed to improper evidence. A defendant has no less right to be present and to be assisted by counsel at a jury's return visit to the crime scene—both to observe and ensure that the jury is not exposed to new or improper evidence, and to be timely informed of any question that may be posed by a juror to the court during the revisit.

Accordingly, we conclude that the Court of Appeal erred in upholding the trial court's ruling barring defendant and defense counsel from being present during the jury's revisit to the crime scene. Because in this case the particular location from which the fatal shotgun blasts were fired was a strongly contested issue that was a significant aspect of the defendant's defense at trial and was potentially relevant not only to the identity of the shooter, but also to the charged lying-in-wait theory of first degree murder and the lying-in-wait special-circumstance allegation, and because the jury's request during deliberations to revisit the crime scene indicates that the jury likely had lingering questions regarding the location of the shooter, we further conclude that the trial court's error in excluding defendant and defense counsel from the jury's return visit cannot be found harmless. Accordingly, we shall reverse the judgment of the Court of Appeal with directions to remand the matter for a new trial.

I

This case arises out of the shotgun murder of Deborah Gregg in November 1998. Gregg lived in a trailer in a rural part of Morgan Hill in Santa Clara County. Her body was found behind her trailer adjacent to a fence that divided her property from a ranch owned by defendant Roy Lopez Garcia. The prosecution charged Garcia with the crime, maintaining that Garcia, motivated by a series of property disputes that had arisen between the two adjoining property owners between May and November 1998, had lain in

wait and had shot Gregg while concealed in the bushes or trees that grew in the border between the two properties. A jury ultimately found Garcia guilty of first degree murder and found true a special circumstance allegation that he had committed the murder while lying in wait. (Pen. Code, §§ 189, 190.2, subd. (a)(15).)[1] The prosecution did not seek the death penalty.

The following factual summary is taken largely from the Court of Appeal's thorough description of the evidence presented at trial.

In May 1998, Garcia acquired the Sleepy Valley Ranch, which was adjacent to Gregg's property. The 250-acre ranch contains no buildings or water wells but has a large spring and creek. The creek forms the approximate boundary between the ranch and an adjacent rural subdivision of homes, including a parcel owned by Gregg. Garcia, who lived with his family in Gilroy and owned a successful carpet business as well as a substantial amount of real property, planned to raise cattle on the ranch located in Morgan Hill.

Gregg, who was employed as a therapist in a mental health clinic in San Jose, lived alone in her trailer on a parcel located at the end of Sleepy Valley Road, a dirt road that once had been paved but had fallen into disrepair and that provided Gregg's only access to her property. Gregg's trailer was located on a corner of her lot and was separated from the nearby creek by a fence.

When Garcia purchased Sleepy Valley Ranch there was some question—initially raised by the seller of the property—whether Gregg's trailer, the fence near the creek, and a well used by Gregg encroached upon the ranch property. At the time of the sale, Garcia and the seller commissioned a survey of the ranch property. The engineer who conducted the survey informed Garcia that based upon his survey, he believed that Gregg's trailer and well were located on Gregg's own property. Despite the engineer's findings, however, Garcia continued to believe that Gregg's trailer and well encroached upon his property.

The main access road to the homes located in the subdivision adjacent to Garcia's ranch, Armsby Lane, is a private road maintained by fees paid by the members of a road association made up of approximately 50 households. Gregg was an active member of the road association, but the prior owner of the Sleepy Valley Ranch never had been a member and never had paid to maintain Armsby Lane. Spur roads off of Armsby Lane—such as Sleepy Valley Road—were also private roads and were maintained by the individual homeowners served by the spur roads.

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

Upon his purchase of the ranch, Garcia believed he had the right to use Armsby Lane and Sleepy Valley Road to access his ranch, and he made plans to improve Sleepy Valley Road so it would be able to support trucks driving to and from his cattle ranch. One Sunday in late May 1998, workers hired by Garcia bulldozed part of Sleepy Valley Road, destroying some of the pavement that had been left on that road and pushing some debris and dirt into the nearby creek located on ranch property. Gregg was particularly concerned about this activity and, at her request, a number of neighbors gathered and met Garcia where the bulldozing work was being done. At this time, the neighbors learned that Garcia had not obtained a grading permit, and they told him that it was illegal to obstruct the creek with debris and that they did not believe his ownership of the ranch gave him the right to use the privately maintained Armsby Lane and Sleepy Valley Road. (It subsequently was determined that Garcia did have the legal right to use those roads to access his ranch.)

The meeting in late May between Garcia and his Armsby Lane neighbors apparently was relatively friendly at the outset, but became less so as the number of concerns expressed by the neighbors increased. Gregg, in particular, angered Garcia during this meeting; although most of the other neighbors were concerned primarily about Garcia's use of their roads, Gregg wanted to know what Garcia was doing on his own property. At one point during the meeting, Gregg spoke to Garcia briefly in Spanish, which incensed Garcia. (There was evidence that Gregg had admonished Garcia in Spanish not to be rude and not to point at her.) Some of the neighbors testified that at this meeting Garcia threatened Gregg, telling her that he could make her "disappear," that she was his enemy now, and that those persons who were his enemies regretted it. As the meeting ended, Gregg offered her hand to Garcia, but he refused to shake it.

In the following months, Gregg and Garcia both registered complaints with various public officials relating to the other's property. Gregg notified state and local land use officials that Garcia was doing illegal work on the creek, including construction of an earthen dam blocking the creek in order to create a pond to provide water to his cattle, and unauthorized grading of an access road. Garcia, in turn, filed a formal complaint with county land use officials against Gregg, contending that her trailer, septic tank, and well were located on his property line and prevented him from fencing his property. Gregg sensed Garcia's apparent hostility to her, and once asked a neighbor to accompany her when she went to speak to Garcia while he was at his ranch.

In September, Garcia filed a civil action against Gregg for trespass, alleging that her trailer and well were located on his land; the complaint sought an injunction to prevent Gregg's alleged encroachment on his ranch.

At the conclusion of an initial court hearing in those proceedings held in October, in which Gregg testified that Garcia had threatened her and Garcia indicated that he did not want trouble with his neighbors but simply wanted to fence his land, the trial court issued an injunction directed to both Garcia and Gregg. The injunction stated that both parties had agreed to the removal of an existing fence that leaned over Garcia's property (anticipating that a new fence would be constructed on an agreed lot line between the two properties) and both also had agreed upon the removal of construction debris from the creek. The injunction further prohibited either party from trespassing on the other's property.

After the hearing, Garcia's attorney sent Gregg's attorney a letter implying that Garcia's attorney considered the civil matter to have been resolved. Gregg's attorney was puzzled by the letter because Garcia's case had not been formally dismissed and the date by which Gregg was required to file an answer and any cross-complaint in the action quickly was approaching. Further, at that point, Gregg was still filing complaints with public officials relating to Garcia's ongoing activities on the ranch, and she did not consider the controversy between the two to have been resolved.

Later in October, a deputy sheriff observed workers employed by Garcia constructing a fence between the properties on a line that Gregg stated was different from the boundary that had been marked by the surveying engineer, and, at the deputy's suggestion, the workers stopped the construction. Two days later, at Gregg's request, another deputy sheriff was present while the engineering firm again marked the boundary line between the two properties and fence construction began along the proper line, which ran between Gregg's trailer and Garcia's ranch land. Garcia and Gregg both were present at this time, and at Gregg's instigation she and Garcia shook hands, agreeing that the boundary dispute had been resolved and that Garcia could build his fence. Garcia mentioned to the deputy that the expense he had incurred because of the dispute was not worth the few feet of land involved, but the deputy also testified that Garcia cooperated with Gregg's requests and did not make any negative comments about her.

The controversy between the two property owners, however, did not end at that point. In early November 1998, Gregg's attorney filed a complaint with the fish and game warden, alleging that Garcia had committed further violations at the creek, and shortly thereafter Gregg submitted an additional complaint to an inspector for the state Division of Safety of Dams, alleging that Garcia had built an illegal 35-foot-high earthen dam on his property. On November 16, an inspector from that agency visited the ranch, later recalling that during his 45-minute stay, Garcia complained continuously about Gregg. The inspector concluded that the dam in question was too small to be within the state's jurisdiction but might fall within county authority.

On November 13, 1998, Gregg filed both an answer and a cross-complaint in the still-pending civil action that Garcia had commenced against Gregg. Gregg's cross-complaint alleged causes of action for encroachment, abatement of a private nuisance, willful and negligent trespass, assault, and slander of title, and it contained an allegation that Garcia had threatened Gregg at the late May meeting by stating to her that "I used to be a street fighter" and that "anyone who becomes my enemy will regret it." The cross-complaint sought injunctive relief against Garcia.

Garcia received Gregg's cross-complaint on November 16, 1998, and met with a new attorney on November 19, informing the attorney of the cross-complaint and also of a notice of a county grading violation that Garcia recently had received. The attorney testified that Garcia thought all of these matters had been resolved when the survey was completed and the fence was constructed, and that Garcia appeared confused and somewhat angry that the situation still was unresolved. Garcia asked the new attorney to find out why Gregg had filed her cross-complaint.

On the following day—Friday, November 20, 1998—the sheriff's department received a report that Gregg had not come to work for two days and that her supervisor had tried to reach her at home but had received no response. Upon arriving at Gregg's property, sheriff's deputies found Gregg's pickup truck parked outside the trailer and two days of mail in her mailbox. Gregg's trailer was unlocked, and when the deputies entered they found no one inside and no indication that the trailer had been burglarized.

The deputies went outside and found Gregg's body on Garcia's side of the fence that divided the two properties. Gregg's body was lying face up, with her head pointed in the direction of the fence and her feet pointed toward the creek bed; she had been killed by shotgun blasts. A cordless drill was found beside her body, suggesting that she had been working on the fence at the time of her death.

On Sunday, November 22, information regarding Gregg's death was broadcast on local television news. A real estate agent who had helped Garcia purchase the ranch heard the news and telephoned him at 11:00 p.m. that day to inform him of Gregg's death. Garcia's wife answered the phone and told the real estate agent that Garcia was asleep, and the real estate agent then informed Garcia's wife of Gregg's death. The following day the real estate agent went to see Garcia at a carpet shop owned by Garcia and told him that Gregg had been murdered. Garcia responded that the matter had "nothing to do with him," but the real estate agent suggested to him that the police might want to talk to him about Gregg's death because of the dispute between the two.

On Wednesday, November 25, the sheriff's department conducted a search of Garcia's Gilroy residence and San Jose carpet shop pursuant to search warrants. At the residence, the sheriff found two 12-gauge Remington shotguns, and more than 100 shotgun shells of varying sizes and manufacture, but subsequent investigation established that the shells found at Garcia's residence were not of the type found at the scene of the homicide.

That same day, Garcia was brought to the sheriff's department for questioning. The investigating deputies first told Garcia that they wanted to speak to him about his property dispute with Gregg. Garcia stated that he did not have any problems with Gregg and denied ever threatening her. When the deputies eventually told Garcia that Gregg had been killed and that her body had been found on his property, Garcia said, "That's a surprise to me." Throughout the interview, Garcia repeatedly denied either threatening or killing Gregg. At the end of the interview, Garcia was arrested and charged with Gregg's murder.

A grand jury subsequently indicted Garcia for murder. The indictment further alleged that defendant committed the crime while lying in wait, in violation of the special circumstance provision of section 190.2, subdivision (a)(15). As noted, *ante*, the prosecution elected not to seek the death penalty.

At trial, which began on July 31, 2000, the prosecution introduced evidence relating the events set forth, *ante*. The prosecution also presented the testimony of George Mumaw, who had done some construction work on Garcia's ranch. Mumaw testified that Garcia, in speaking about his neighbors on one occasion, had said, "they don't know who [they are] messing with" and that "for $500 he could make someone disappear like that, and he snapped his fingers." Mumaw indicated that the statement "was out of character for him . . . . Roy was, was not like that. He's a nice mellow guy. It just kind of threw me back a little bit, you know." Mumaw added: "[I]t was the seriousness of his tone that caught me off guard. It wasn't in a joking way. But people get upset and say things, you know." Mumaw also stated that on the same occasion Garcia had stated that "a lady in a trailer" "was causing him a lot of legal problems and that he was . . . tired of it, and he went back to saying that, you know, that they don't know who they're messing with." Mumaw further indicated that although Garcia's statements "made an impression on me," it was not "an urgent impression" that led him to believe he needed "to go . . . warn people, but it—it was out of character for Roy to talk like that, and that's what struck me as strange . . . because it wasn't like him. He was a quiet man." Another witness testified that he had heard Garcia refer to Gregg as a "bitch."

The prosecution further presented the testimony of a prison informant, Timothy Villalba, who testified that he met Garcia on one occasion while the two were together in a holding cell awaiting court appearances in separate proceedings. Villalba testified that at that single meeting Garcia confided that his (Garcia's) homicide defense would be that his neighbors were "setting him up" for murder, and that Garcia additionally told him that the sheriff had taken the "wrong" weapons from his home and that "they would never find the gun that was used" to kill the victim because he (Garcia) "had gotten rid of it" (" 'it's disappeared' "). Villalba also testified that Garcia disclosed certain information regarding Garcia's proposed hiring of a defense attorney, information the prosecutor subsequently argued that bolstered the veracity of Villalba's testimony.

In testifying in his own defense, however, Garcia stated that he had never spoken to Villalba and that the first time he saw Villalba was when Villalba testified in court. The jury also was presented with a substantial amount of additional evidence to impeach the credibility of Villalba's testimony, including evidence that Garcia never spoke in the kind of "gang Spanish" that Villalba said Garcia had used during their alleged conversation, as well as abundant evidence regarding Villalba's untrustworthiness and motivation to lie. In the latter regard, the jury was informed that Villalba had been convicted of murder and three counts of robbery and was serving a sentence of 25 years to life in prison, that he had been in a prison gang and was a security risk who often was placed in administrative segregation for violating prison rules, that his visits to county jail resulting from his willingness to testify at the trial offered him benefits (including the opportunity to visit with his family) that he did not possess when confined in prison, that he had been denied parole on three or four occasions, and that, as a result of his testimony in favor of the prosecution, the prosecutor had agreed to advise the parole authorities at an upcoming parole hearing about his cooperation in this case. (Pursuant to the applicable California statute (§ 1127a), the jury was instructed that the testimony of such an in-custody informant must be viewed "with caution and close scrutiny.")

In addition to the foregoing evidence, considerable forensic evidence was introduced by both parties relating to evidence found at the crime scene and to the probable location from which Gregg was shot.

The medical examiner who examined Gregg after her death found nearly 60 shotgun pellet wounds in Gregg's body, mostly on the right side of her upper torso—in her chest, shoulder, and neck. She had no defensive wounds on her body. The medical examiner estimated from the condition of Gregg's body that she had been shot by someone standing at almost her same level, shooting slightly upward from a distance of at least two feet away. The

location of the wounds suggested that Gregg was looking in the general direction of the shooter when she was fired upon.

Some of the shotgun pellets obtained from Gregg's body were analyzed by Edward Peterson, the prosecution's firearms and forensics expert, who testified that one of the pellets was a copper-plated lead pellet of No. 4 buckshot, a common size of buckshot found in 12-gauge shot shells. Peterson also testified, however, that none of the shotgun shells found at Garcia's home that had been submitted to him for analysis contained No. 4 shot and further that he could not determine whether Garcia's 12-gauge shotguns ever had fired No. 4 copper-plated buckshot. Based on the number of pellets found in and around Gregg's body, Peterson was of the view that the killer fired at least two shots at Gregg.

Sheriff's investigators at the scene of the crime found that there were 11 shotgun pellet marks in the wooden fence that formed a tight pattern and that three of the pellets had passed through the top of the fence and had lodged in the side of Gregg's trailer, with one actually fully penetrating the wall and leaving a hole in the side of the trailer. The investigators determined the probable trajectory of the shotgun pellets that passed through the fence by placing 28-inch wooden dowels in the holes in the fence and peering down the dowels while looking over the fence. One of the investigating detectives, Rick Sprain, testified that, utilizing this method, he determined that the pellets probably were fired from a weapon held in a hollowed-out area of a dead oak tree located at the edge of the creek bed on Garcia's property, approximately 23 feet from the fence—an area from which the shooter would have been hidden by vegetation. Sprain testified that two round pellet-shaped holes found in a leaf from the oak tree appeared to line up with the angle created by the fence holes. He believed that if the shooter had come closer, Gregg might have heard the approach because of the decaying vegetation on the ground. On cross-examination, Sprain acknowledged that he had not taken measurements from the holes in Gregg's trailer to Gregg's body, and had not taken into account the holes in the trailer in determining the trajectory of the shotgun pellets and the probable location of the shooter. Sprain also conceded on cross-examination that although he and other sheriff's investigators had conducted an extensive search of the area of the creek bed from which he believed the shotgun blasts were fired, no shotgun shells, fiber evidence, shoe prints, broken twigs, or other potential evidence was found.

Peterson, the prosecution's forensic expert, testified that police officers commonly use dowel sticks to estimate a shotgun's angle of fire, and that although the method is not perfect because pellets can deflect in mid-flight, a general trajectory usually can be determined from multiple holes. Based on the spread of the pellets, Peterson concluded that the shooter had been

standing at least 10 feet from Gregg, but Peterson could not give a better approximation of the distance.

The defense vigorously contested the prosecution's crime scene investigation and the conclusions drawn by its experts as to the probable location from which Gregg had been shot. At the request of the defense, James Norris, who headed the forensic service division of the San Francisco Police Department and also performed work as a private forensic science consultant, investigated the crime scene and examined the section of the fence containing the shotgun pellet holes. (After the crime, the sheriff's department had removed the fence segment from the property and had placed it in storage to preserve it as evidence.)

Norris testified on behalf of the defense that in determining the trajectory of the shotgun blast and the probable location of the shooter, it was important to take into account the shotgun pellet hole that was located in the side of Gregg's trailer. Based on his measurements of the fence, Norris reconstructed a "virtual fence" at the crime scene, and then, using a laser, determined the trajectory of the fatal shotgun blast with reference to the hole that one of the pellets had made in the trailer and the location of a graze mark that one of the pellets had made in the fence. Norris concluded from his investigation that Gregg had been shot from a relatively flat, open area situated to Gregg's left as she faced her trailer, and not from behind a tree or bushes in the creek bed as the prosecution's experts had suggested. Norris testified that the distance between the flat, open area in question and Gregg—about 15 feet—was consistent with the pattern of the shotgun pellets on the fence and in Gregg's body, whereas the greater distance to the area beyond the creek bed was inconsistent with that pattern. Norris additionally concluded that Gregg probably had been hit by two blasts from a double-barreled shotgun and that, in light of the slope of the land, the shooter had crouched or squatted during the shooting, holding the shotgun to his or her side. Finally, Norris testified that the holes in the leaf in the oak tree in the creek bed, which detective Sprain testified were made by shotgun pellets and which Sprain relied upon in identifying the probable location of the shooter, likely were made by insects, and that if such a leaf actually had been hit by shotgun pellets, the leaf would have been blown off the tree rather than being left intact with such holes.

In rebuttal, the prosecution's forensic expert (Peterson) disputed Norris's conclusion, suggesting that the recoil from the shotgun likely would have knocked over a person if he or she had fired the weapon while crouching or squatting on downward sloping land. Peterson stated that he believed the weapon probably was fired from an area of bush along the side of the creek bed.

On August 17, 2000—after the prosecution had completed its case-in-chief and Norris had testified for the defense—the jury visited the crime scene for the first time. Prior to the beginning of the trial, both sides had agreed that a jury view of the crime scene would be helpful, and the trial court had indicated that it would permit such a jury view if defendant waived his right to be personally present at the visit and if no testimony were taken at the crime scene. Defense counsel apparently did not object to the requested waiver of defendant's right to be present at the jury view, and shortly before the first crime scene visit, defense counsel explicitly agreed that only defense counsel, and not defendant, would be present at the jury view. The court also ruled that the jury visit would be conducted as a closed session of the court—no neighbors, family members, members of the public, or media representatives would be permitted to attend, and the court reporters would not be required to be present, but the court and counsel for both parties would be present. The jurors would not be permitted to ask questions while they were at the crime scene and would not be permitted to enter Gregg's trailer. Finally, the court ruled that the fence through which the shotgun pellets had been fired, which had been removed by the sheriff's department and secured as evidence, would be replaced on the property by the sheriff's deputies in an attempt to recreate the crime scene as it appeared on the day of Gregg's death.

When the jury arrived at the crime scene on August 17, not only had the segment of the fence containing the shotgun pellet holes itself been returned to and reconstructed on the property, but the dowels that had been placed in the holes in the fence by the sheriff's deputies in order to determine the trajectory of the shotgun pellets also had been inserted in the fence. Defense counsel were present during this visit, and the record does not reflect that the defense raised any objection to the status of the crime scene at that time. Before leaving the courthouse prior to the visit, the court informed the jurors that they could "pretty much wander any place" at the crime scene, and the jury apparently spent at least an hour at the crime scene. The jury view itself was not reported.

In closing argument, the defense relied heavily on the testimony of forensic expert Norris, maintaining that Norris's conclusions demonstrated that the killer was close enough to Gregg at the time of the shooting to be visible to her, and that the killer therefore most likely was someone with whom Gregg was comfortable and whom she did not fear—a description that did not fit Garcia, with whom Gregg had had numerous disagreements.

In its closing argument, by contrast, the prosecution downplayed the significance of the conflict in the evidence regarding the likely location from which Gregg had been shot, maintaining that the location "really doesn't tell you who the shooter was, it really doesn't."

After closing arguments were completed, the trial court gave its final instructions to the jury and the jury began its deliberations.

On August 31, 2000—after the jury had deliberated for two days—the jurors sent a note to the court, requesting permission to revisit the crime scene. The prosecution indicated it had no objection to a return visit by the jury, but defense counsel objected, explaining that he had been surprised by a number of occurrences at the first visit, including the circumstance that employees of the sheriff's department, when replacing the section of the fence that had been removed and placed in storage, had inserted into the fence the dowels that had been utilized by the investigating detective in making his determination as to the trajectory of the fatal shots. Defense counsel also stated that he would not waive defendant's right to be present if the trial court were inclined to authorize a return visit.

The trial court stated it had considered the matter and had determined that the jury's return visit to the crime scene during deliberations "would be like the jury during deliberations wanting to go look at photographs or diagrams that are in evidence. . . . Technically it is deliberations, so technically I guess none of us have a right to be there." When defense counsel suggested a return visit to the crime scene would amount to "new evidence," the trial court disagreed, indicating that "[i]t's looking at evidence they've already seen . . . ." Defense counsel specifically objected to the fence being put back up with the dowels inserted, but the trial court overruled the objection, stating, "That's what they have already seen, so they're entitled to see that again." The trial court ruled that neither defendant nor either counsel would be permitted to attend the jury's revisit to the crime scene.[2]

When the jury was informed by the court that it would be permitted to revisit the crime scene, one of the jurors asked whether the fence would be at the scene, stating, "That's important." The court confirmed that the fence would be there.

The jury's revisit to the crime scene took place on September 5, 2000.[3] Before leaving for the crime scene, the jurors met with the judge in court. Pursuant to the court's order, neither defendant nor counsel was present. The

---

[2] After the trial court initially stated that it would permit the jury revisit without defendant's presence, defense counsel first indicated that he would prefer that no counsel be present at the revisit, but thereafter defense counsel altered his position and made it clear that he was not waiving his right to be present at the jury's return visit. At that point, the trial court affirmatively stated that the reason neither defendant nor the attorneys would be present at the return visit was that the court had ordered that they could not attend.

[3] August 31—the day the jury requested the return visit—was a Thursday, and the jury did not deliberate on Friday, September 1. Tuesday, September 5, was the first court day after the Labor Day holiday weekend.

court advised the jurors that they would be permitted to discuss the case amongst themselves at the crime scene, but that they should do so "out of earshot" of the judge and everybody else. At this time, one juror asked the court whether the juror could "use my laser pointer on the site." When the court asked for what purpose, the juror said "just to shoot a line." The court responded: "No, I think that would be considered taking evidence and you shouldn't do it. Do whatever sight lines you can do with whatever is down there." The jurors, accompanied by the trial judge, then were driven to the crime scene and spent almost an hour at the site.

The jury resumed its deliberations the following morning and reached a verdict very shortly thereafter, finding defendant guilty of first degree murder and finding true the special circumstance that the murder was intentional and was carried out by defendant while lying in wait.

In January 2001, prior to filing a motion for new trial, defendant filed a motion seeking an evidentiary hearing to create a record of what occurred at the jury's September 5, 2000 return visit to the crime scene. At a hearing held on February 1, 2001, the trial court ruled that the prosecution and defense counsel, who had attended the initial August 17, 2000 jury view of the crime scene, could meet to work out a settled statement as to what had occurred at that first visit, but it denied the defense request either to conduct an evidentiary hearing regarding what occurred during the September 5 visit or to order a settled statement prepared regarding that visit. The court stated that the September 5 visit was undertaken as part of the jury's deliberations, not for the purpose of receiving new evidence, that the guidelines for the jury's conduct during the September 5 visit had been placed on the record, and that the defense had presented no evidence indicating that the jury had failed to follow those guidelines. The court noted that it had denied a juror's request to use a laser pointer to take a sight line during the return visit, because that would have been tantamount to taking new evidence. The court also indicated that the portion of the fence that had been removed and secured as evidence had been returned to and reinstalled at the crime scene by the sheriff's department prior to the jury's September 5 visit, and that the court had observed jurors looking down the dowels that had been placed in the fence in an apparent attempt to locate where the shooter had been.

On March 1, 2001, defendant filed a motion for new trial, accompanied by a renewed motion to settle the record and for an evidentiary hearing to establish the relevant facts surrounding the jury's September 5 return visit to the crime scene. In support of these motions, the defense submitted declarations of each of defendant's two trial attorneys (Thomas Nolan and Christine Pack), of the forensic expert (Norris) who had testified on defendant's behalf at trial, and of a defense investigator (Steve Gore) who had interviewed two of the jurors who had revisited the crime scene on September 5.

The declaration of each defense attorney described his or her observations during the jury's August 17, 2000 visit to the crime scene. Nolan's declaration additionally stated that had he (Nolan) been present on September 5 when a juror asked whether he could use a laser pointer at the crime scene to shoot a line, he would have objected to the portion of the trial court's response in which the court told the juror to "[d]o whatever sight lines you can do with whatever is down there," because such a response by the trial court effectively encouraged the jury to determine the location of the shooter by using the methodology that had been utilized by the prosecution witnesses and had been criticized by the defense forensic expert.

The declaration of defense forensic expert Norris stated, among other matters, that "a juror who conducted the prosecutor's dowel experiment at visit one may well have had an entirely different view at visit two" for a number of reasons: (1) "[g]iven the repeated fitting and removal of dowels from the fence, it is a near certainty that the pellet holes themselves deteriorated and changed"; (2) "[e]ven if the holes were preserved exactly, because the police did not create dowels, the diameters of which were measured precisely to the diameters of the fence holes, there is an excellent chance there was some 'play' in the dowels even when they were fitted into the fence"; (3) because the fence "is located on sloping ground" and "[n]o measurement was made by the police of the verticality of the fence or its posts, using a plumb line or level," "[i]t is . . . impossible to say that the precise verticality of the fence in its original state was re-accomplished when the fence was returned to the scene"; and (4) because "[t]he police made no measurement of the angles of the dowels to the ground . . . it is not possible to determine whether the dowels were returned to their original state . . . ."

Finally, the declaration of the defense investigator Gore stated that he had interviewed two jurors who had revisited the crime scene on September 5 and that, among other matters, one of the jurors had indicated that another juror had "brought a yellow glove to the second jury visit to help the jurors test the prosecution theory regarding [the] position of the shooter. The point of the experiment, according to [the juror], was to determine whether a person in the bushes would have been visible from where the victim had been standing. Jurors found they could not see the un-gloved hand but could see the gloved hand and discussed their view that 'if you wanted to hide, you could hide.' " The defense investigator also stated that the jurors indicated they had not stayed together as a group during the revisit and different members of the jury had examined different portions of the crime scene and discussed various matters with only some of the other jurors.

The court held a hearing on March 16, 2001, on defendant's motion for new trial and his renewed motion for an evidentiary hearing. At the conclusion of the hearing, the trial court denied both motions, reiterating its view that the jury's return visit to the crime scene during deliberations did not constitute the taking of new evidence, but simply the reexamination of evidence that already had been introduced at trial. The court again noted that when, during the preparation for the second visit, one of the jurors inquired whether he would be permitted to take a laser pointer to the site and shoot a line, the court responded in the negative, stating this would be tantamount to taking new evidence. The court further noted that although counsel and defendant were not present when the juror's question was asked and answered by the court, the court had informed all counsel shortly after the second visit about the juror's request and the court's response, and both counsel agreed at that time that the court's response was correct and neither had objected to its being given.[4] The court indicated that even if, as defendant argued, the court had erred in answering the juror's question without notifying counsel and giving counsel an opportunity to participate in formulating a response, and even if defense counsel was not estopped from complaining of the lack of notice by virtue of counsel's earlier acquiescence in the court's response, the error was not prejudicial because the court's response was legally correct.

With respect to the incident of the jurors' alleged use of the yellow glove during the jury revisit, the trial court found that, assuming the incident had occurred as alleged and further assuming that the juror's conduct in this regard was improper, the error was harmless beyond a reasonable doubt because "[t]he same action and result would have occurred if a juror, purely

---

[4] After the trial court explained the basis of its ruling, defense counsel attempted to introduce evidence to establish that when the trial judge had spoken to Attorney Nolan after the September 5, 2000 visit, the judge simply had informed Nolan that a juror had requested permission to use a laser pointer to shoot a line at the crime site and that the judge had denied the request, but that the judge had not mentioned his further comment to the juror to "[d]o whatever sight lines you can do with whatever is down there." At the March 16, 2001 hearing, the court denied defense counsel's request to include counsel's version of the conversation in the record, indicating that the defense motions for new trial and for an evidentiary hearing already had been submitted and denied.

After this court granted review in this case, defendant filed a habeas corpus petition in this court, accompanied by a declaration by Nolan setting forth his version of his unrecorded conversation with the trial judge that occurred shortly after the September 5 return visit. Defendant requests that we order an evidentiary hearing if the content of his unrecorded conversation with the trial judge is determined to be significant. Because, as explained, *post*, we conclude that defendant's conviction must be reversed in light of the trial court's error in barring defendant and defense counsel from being present at the jury's return visit to the crime scene, the habeas corpus petition shall be denied as moot.

by chance, wore a yellow baseball cap or yellow shirt in the normal course of their dress. We would have the same result if no bright colors were worn by any of the jurors, that is, a person positioned as that juror positioned himself would not be seen from where the other jurors were making their observations."

In sum, the trial court denied both the motion for an evidentiary hearing and the motion for new trial, entering judgment in conformity with the jury verdict and imposing a sentence of life imprisonment without the possibility of parole on the basis of defendant's conviction of first degree murder with a lying-in-wait special circumstance finding.

On appeal, the Court of Appeal affirmed the judgment—as noted, *ante*, by a two-to-one vote. With regard to the initial issue presented by the appeal (whether the trial court erred in barring defendant and defense counsel from being present when the jury revisited the crime scene after it had begun its deliberations), the majority of the appellate court agreed with the trial court's conclusion that a jury revisit to a crime scene during deliberations does not constitute the taking of new evidence and that, as is the case when a jury reviews physical evidence in the jury room during deliberations, neither defendant nor defense counsel has the right to be present during such reexamination. With regard to defendant's claim that the jury in this case in fact had received new evidence during the jury revisit—most significantly, the evidence resulting from a juror's having brought a yellow glove to the site during the second visit and having conducted a visual experiment with the glove—the Court of Appeal majority held that the declaration of the defense investigator relied upon by defendant in support of this point was inadmissible hearsay that could not be used to impeach the jury verdict. The Court of Appeal majority further rejected the remainder of defendant's objections to the trial court's rulings and affirmed the judgment in its entirety. The dissenting Court of Appeal justice concluded that a jury's return visit to a crime scene during deliberations cannot properly be equated with a jury's examination of a physical exhibit in the jury room and that the trial court erred in barring defendant and defense counsel from being present at the jury's return visit.

We granted review to consider the validity of the Court of Appeal's conclusion.

## II

Defendant challenges the rulings of the trial court and the Court of Appeal relating to the jury's return visit to the crime scene on a variety of grounds.[5] As we shall explain, we conclude that we need reach only the first of these claims—that the trial court erred in barring defendant and defense counsel from being present at the jury's return visit to the crime scene—because we conclude that the trial court did err in this respect and that, under the circumstances of this case, the error was prejudicial.

As the parties and the Court of Appeal recognize, this court's opinion in *People v. Bush, supra,* 68 Cal. 623 (*Bush*), is the seminal California decision regarding the right of a criminal defendant and his or her counsel to be present at a jury view of a crime scene (or other site outside the courtroom) whenever such a jury view is authorized by the court pursuant to section 1119.[6] In *Bush,* the defendant challenged his conviction on the ground that the trial court improperly had authorized court officers to transport the jury to

---

[5] The petition for review raised the following six separate claims arising out of the proceeding related to the jury's revisit to the crime scene:

"I. Did the Court of Appeal err in limiting the categorical rule of this court in *People v. Bush* that every jury view to the crime scene necessarily constitutes a taking of evidence at which a defendant and counsel have a right to be present?

"II. Did the possibility that new evidence would be taken during the second jury view of the crime scene in itself render that view a critical stage of defendant's trial at which he had a state and federal constitutional right to be present with counsel?

"III. Did the Court of Appeal commit state and federal constitutional error with its unprecedented holding that the jury could properly deliberate at the crime scene while being visually observed by a trial judge, although defendant and his counsel were barred from being present?

"IV. Did the jury's conduct in performing experiments outside the jury room with objects that had not been admitted into evidence or addressed by testimony deprive defendant of his state and federal rights to counsel, confrontation, and due process of law?

"V. Did the trial court deprive defendant of due process by responding to a juror's question concerning the conducting of the jury's second visit to the crime scene without informing defendant and his counsel of the query or consulting them as to the proper response?

"VI. Did the trial court violate defendant's state and federal due process rights by (1) serving as the sole witness concerning what occurred during an unreported telephone call to counsel and during the jury's second view of the crime scene and (2) barring the defense from offering any evidence of what transpired during these events?"

[6] Section 1119, first enacted as part of the original Penal Code in 1872, currently provides in full: "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, or any personal property which has been referred to in the evidence and cannot conveniently be brought into the courtroom, it may order the jury to be conducted in a body, in the custody of the sheriff or marshal, as the case may be, to the place, or to the property, which must be shown to them by a person appointed by the court for that purpose; and the officer must be sworn to suffer no person to speak or communicate with the jury, nor to do so himself or herself, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time."

the scene of the alleged offenses in the absence of the defendant or his counsel. On appeal, this court upheld the defendant's challenge, concluding that the trial court's action was improper and conflicted with the defendant's right to appear and defend in person and with counsel.

In reaching this conclusion in *Bush*, the court observed initially that "[i]t is impossible that a jury could go and view such a place without receiving some evidence, through one of their senses, viz., that of sight." (*Bush, supra,* 68 Cal. 623, 630.)[7] The court then continued: "It is often most important for the defendant and his counsel to be able to perceive exactly what impression is being made upon the jury by any portion of the evidence given in on his trial. And it may frequently happen that it is within their power then to introduce other evidence which might tend to disabuse the body of a wrong impression, or the counsel might by fair and legitimate argument be able to convince them of the right view to be taken of such evidence." (*Bush,* at p. 631.)

In support of the conclusion that defendant and counsel have the right to be present during a jury view, the court in *Bush, supra,* 68 Cal. 623, cited and quoted a number of out-of-state decisions, including (id. at p. 633) a decision of the Arkansas Supreme Court in *Benton v. State* (1875) 30 Ark. 328, 350, in which that court observed: "The view of the place where the crime is alleged to have been committed, by the jury, is part of the trial, and may be an important step in the trial, and the presence of the prisoner at the view, . . . that he may have an opportunity to observe the conduct of the jury, and whatever occurs there, might be of utmost consequence to him."

The court in *Bush* concluded its discussion as follows: "We are of the opinion that *it is not intended* by section 1119, Penal Code, *that a view* to be taken *by the jury* of any place or places contemplated by that statute *should ever be ordered by the court, or take place unless in the presence of the defendant.*" (*Bush, supra,* 68 Cal. at p. 634, italics added.)

---

[7] Although historically there was some difference of opinion in other jurisdictions as to whether a jury view of the crime scene or other location properly should be considered the receipt of "evidence," more recent decisions in other jurisdictions overwhelmingly recognize that a jury view constitutes the receipt of evidence. (See generally 2 McCormick on Evidence (5th ed. 1999) Demonstrative Evidence, § 266, p. 29; 4 Wigmore on Evidence (Chadbourn rev. 1972) § 1168, p. 388; 2 Weinstein's Federal Evidence (2d ed. 2005) § 403.07[4], p. 403-76.) As the decision in *Bush* demonstrates, for well over a century California consistently has recognized that a jury view constitutes the receipt of evidence. (See also *People v. Milner* (1898) 122 Cal. 171, 184 [54 P. 833] ["in so viewing the premises the jury was receiving evidence"]; Evid. Code, § 140 [" 'Evidence' means testimony, writing, material objects, *or other things presented to the senses* that are offered to prove the existence or nonexistence of a fact" (italics added)]; Cal. Law Revision Com. com., 29B pt. 1 West's Ann. Evid. Code (1995 ed.) foll. § 140, p. 15 [" 'Evidence' is defined broadly to include the testimony of witnesses, tangible objects, sights (*such as a jury view* or the appearance of a person exhibited to a jury) . . . ." (italics added)].)

Defendant, relying upon this apparently categorical language in *Bush*, contends that this language itself establishes that the Court of Appeal erred in holding that the trial court properly permitted the jury in this case to revisit the crime scene, after deliberations had begun, in the absence of defendant or defense counsel. The Attorney General, on the other hand, maintains that the language in *Bush* properly must be interpreted in light of the facts presented by that case, and because *Bush* itself did not involve a jury's *return* visit to a crime scene after the close of evidence and during the jury deliberation process, *Bush* cannot be viewed as having definitively resolved the issue raised by the present case.

On this initial point we agree with the Attorney General. Although the opinion in *Bush* speaks categorically, the case itself involved a jury view that took place during the presentation of evidence at trial. Although numerous California decisions since *Bush* uniformly have reiterated the principle that a defendant and defense counsel have the right to be present at a jury view (see, e.g., *People v. Bolin* (1998) 18 Cal.4th 297, 325 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Lang* (1989) 49 Cal.3d 991, 1025–1026 [264 Cal.Rptr. 386, 782 P.2d 627]), these decisions—like *Bush*—all have involved jury visits to a crime scene that occurred during the presentation of evidence at trial. Because neither *Bush* nor any other California decision explicitly has addressed the question whether a criminal defendant and his or her defense counsel are entitled to accompany the jury when it returns to a crime scene after the jury has begun deliberations, we disagree with defendant's contention that the Court of Appeal's decision in this case can and should be rejected simply on the basis of stare decisis.[8]

---

[8] The only two California decisions of which we are aware that refer to a possible jury view during deliberations are *People v. Hawley* (1896) 111 Cal. 78 [43 P. 404] and *People v. Peggese* (1980) 102 Cal.App.3d 415 [162 Cal.Rptr. 510].

In *Hawley*, before the close of evidence the defendant had requested that the jury be permitted to view the crime scene, but the trial court denied the request after a majority of the jurors indicated they did not wish to view the premises. During deliberations, however, the jury informed the court that it did not believe it could reach agreement without viewing the premises. The defendant initially agreed to such a mid-deliberation jury visit and the trial court indicated it was prepared to permit such a visit, but because it was late in the day the trial court with the defendant's consent permitted the jurors to go home overnight. The following day, when the defendant objected to the court's having permitted a separation of the jury overnight, the court commented negatively on the defendant's change of position and told the jury to resume deliberations without viewing the crime scene. After receiving the judge's comments, the jury quickly returned a conviction. On appeal, this court reversed the conviction in light of the judge's remarks, but suggested in dictum that permitting a view of the premises after the case had been submitted to the jury, although "an irregularity," would fall within the discretion of the trial court "upon the request of the defendant." (*People v. Hawley, supra*, 111 Cal. at pp. 84–85.) The decision in *Hawley*, however, did not address the question whether defendant and defense counsel would have the right to be present at such a jury view.

In *Peggese*, a jury that had not visited the crime scene during the presentation of evidence requested during deliberations to view the crime scene for the first time. The trial court,

Although we thus agree with the Court of Appeal that the specific issue before us properly is viewed as a matter of first impression, we disagree with the Court of Appeal's resolution of this issue on the merits. As noted, in concluding that it was appropriate for the trial court to permit the jury to return to the crime scene after it had begun its deliberations, while barring defendant and his counsel from being present during the jury's return visit, the Court of Appeal equated the jury's revisit to the crime scene with a jury's examination in a jury deliberation room of an exhibit that previously had been admitted into evidence at trial. Because a defendant and defense counsel have no right to be present in the jury deliberation room when the jury reviews such an exhibit, the Court of Appeal reasoned that a defendant and his or her counsel similarly are not entitled to be present when a jury revisits the scene of a crime after jury deliberations have begun.

In our view, the Court of Appeal's conclusion is unpersuasive for a number of reasons. First, we agree with the dissenting justice in the Court of Appeal that a jury view of a crime scene during deliberations cannot be equated, for this purpose, with a jury examination of an item of physical evidence in the jury room. Unlike a jury's examination of an exhibit in the isolated and controlled environment of a jury deliberation room, a jury's return visit to the site of a crime—particularly the kind of extensive outdoor crime scene at issue in this case—creates a much greater risk that the jury potentially will receive new or improper evidence. As the dissenting justice in the Court of Appeal observed: "Even with precautions in place, it simply is not possible to anticipate and exclude all potential evidentiary intrusions, be they planned or inadvertent, such as an unreported or unexpected physical change in the premises, the uninvited appearance and commentary of a neighbor or bystander, or the unauthorized performance of jury experiments or tests." Accordingly, even if a jury's return visit to a crime scene does not inevitably or invariably result in the jury's receipt of new evidence, in view of the very substantial risk that such a return visit will lead to the jury's receipt of new evidence we believe that such a revisit to the crime scene is different in kind from a jury's examination of an exhibit during deliberations

without objection from the defendant, denied the request, explaining that to permit a jury view at that point would require a reopening of the case and would present too many hazards, and that the trial court did not believe that the circumstances warranted it. On appeal, the defendant contended that the trial court had abused its discretion in denying the jury's request, but the Court of Appeal upheld the trial court's ruling, finding no abuse of discretion. (*People v. Peggese, supra,* 102 Cal.App.3d at p. 421.) In light of its conclusion, the appellate court in *Peggese* had no occasion to discuss whether the defendant and counsel would have had a right to attend the jury visit had the trial court in that case granted the jury's request, but in any event the facts in *Peggese* clearly are distinguishable from those at issue in the present case. Because the jury in *Peggese* had not visited the crime scene during the presentation of evidence, the requested jury view during deliberations in that case could not plausibly be characterized as simply a reexamination of evidence that the jury already had been exposed to at trial.

in the confines of a jury deliberation room. As the dissenting justice in the Court of Appeal noted, a jury revisit to the crime scene that occurs during deliberations poses no less a risk that new evidence will be received than a jury's return visit to the crime scene that occurs during the evidentiary portion of the trial, at which a defendant and his or her counsel clearly would have the right to be present under this court's decision in *Bush, supra,* 68 Cal. 623.

Furthermore, the Court of Appeal, in concluding that the presence of a defendant and defense counsel is not required when a jury revisits a crime scene during deliberations, failed adequately to take into account section 1138 and the numerous California cases interpreting and applying that provision. Section 1138, initially enacted in 1872 as part of the original Penal Code, provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. *Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called.*" (Italics added.)

■ Although the terms of section 1138 refer to the jury's "disagreement . . . as to *the testimony*" (italics added) and to the jury's desire to be informed "on any *point of law*" (italics added), past cases have not interpreted the statute narrowly to apply only to requests for the readback of testimony or for reinstruction on the law, but rather, in light of the evident legislative purpose underlying the provision, have found the statute applicable whenever a jury, during deliberations, requests to reexamine *any evidence* that has been introduced at trial (for example, exhibits or documents as well as oral testimony) and whenever a jury poses any question to the court that may affect the jury's consideration or resolution of the case (for example, questions relating to factual or evidentiary matters, as well as to questions of law). (See, e.g., *People v. Price* (1991) 1 Cal.4th 324, 414 [3 Cal.Rptr.2d 106, 821 P.2d 610] [exhibit]; *People v. Hogan* (1982) 31 Cal.3d 815, 848–850 [183 Cal.Rptr. 817, 647 P.2d 93] (lead opn.) [exhibits]; *People v. Chagolla* (1983) 144 Cal.App.3d 422, 432 [193 Cal.Rptr. 711] ["Penal Code section 1138 requires that any questions posed by the jury regarding the law or the evidence be answered in open court in the presence of the accused and his or her counsel"].) Moreover, although the literal language of the statute further provides that "the information required [by the jury] must be given in the presence of, *or after notice to,* the prosecuting attorney, and the defendant or

his counsel, *or after they have been called*" (italics added), past cases reasonably have interpreted this language not only to require that the defendant and counsel be given notice of the jury's inquiry, but also to afford the defense the right, once so notified, to be present and to have an opportunity to have meaningful input into the court's response to the jury's inquiry. (See, e.g., *People v. Jenkins* (2000) 22 Cal.4th 900, 1026–1027 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Wright* (1990) 52 Cal.3d 367, 402 [276 Cal.Rptr. 731, 802 P.2d 221]; *People v. Knighten* (1980) 105 Cal.App.3d 128, 132 [164 Cal.Rptr. 96].)

As these and other authorities make clear, the procedural safeguards embodied in section 1138 recognize that both defense counsel and prosecuting attorneys frequently can play a crucial role at this juncture, examining transcripts or exhibits that court officials are intending to provide to the jury (in order to ensure that only appropriate material that has been admitted into evidence actually is given to the jury), or alerting the trial court to potential problems with a proposed response to a jury inquiry (so as to avoid a legally questionable answer and potential prejudice to the defendant or the prosecution).

For comparable reasons, we conclude that when a jury, during deliberations, requests to revisit the scene of a crime and is permitted to do so, a defendant and his or her counsel have a right to be present at the return visit. First, the defendant and counsel are entitled to observe the site at the time of the revisit in order to be in a position to alert the court and court officials to any alterations or changes in the site that may have occurred since the jury's prior view of the crime scene during the presentation of evidence at trial. If the crime scene has been altered since the jury's prior visit, the second jury view would involve the receipt of new evidence. Just as a defendant and defense counsel may not be prohibited from being present when the court or court officials identify and designate a particular exhibit that is to be provided to the jury in response to a jury request, the defendant and counsel may not be precluded from observing the state of the crime scene as it exists at the time of any return visit authorized by the court.

Second, the presence of a defendant and defense counsel during such a return visit is additionally necessary to ensure that the defendant and counsel are timely apprised of any questions that may be posed by the jury to the court during such a visit, so that the defense will have the opportunity to advance its view regarding the appropriate response before the court addresses such an inquiry. As is illustrated by the juror's question to the court in the present case regarding the proposed use of a laser pointer "to shoot a

line" at the crime scene, questions of this nature frequently arise during a jury's visit to a crime scene, and under section 1138 a defendant and his or her counsel are entitled to be timely informed of those questions and to be provided an adequate opportunity to participate in the court's determination of the proper response.

Third, as the facts of this case also illustrate, there is a substantial risk that a jury visit to the crime scene—particularly a visit that occurs at the jury's request during deliberations, after questions or discrepancies regarding details of the crime may have arisen among the jurors—may lead to the jury's conducting new and improper experiments or tests that go beyond the bounds of a jury's proper examination of the evidence that has been admitted at trial. Whether or not the challenged incident in the present case involving a juror's introduction of a yellow glove into the crime scene went beyond the limits of appropriate conduct, the danger that improper activities will occur in such a setting clearly is substantial, as is demonstrated by the separate inquiry from another juror with regard to his or her intent to use a laser pointer at the crime scene. In view of the substantial risk that such improper conduct may occur during a jury's return visit to a crime scene—a risk that is considerably greater when the jury is free to explore the bounds of a crime scene than when it examines an identified exhibit in the confines of a jury deliberation room—we believe a defendant and his or her counsel are entitled to be present during the return visit so they can observe the jury's activities, bring to the trial court's attention any questionable conduct of which they become aware, and be in a position to ensure that the trial record accurately reflects what has occurred.

Accordingly, in light of the provisions of and purposes underlying section 1138, and the California authorities that have interpreted and applied this statutory provision, we conclude that section 1138 affords a defendant and his or her counsel the right to be present whenever a trial court, upon a jury's request, permits the jury to return to a crime scene once jury deliberations have begun.[9]

---

[9] Although defendant maintains that a jury's return visit to a crime scene during deliberations constitutes a "critical stage" of the criminal proceedings at which a defendant and his or her counsel have a *constitutional* right to be present under both the federal and state Constitutions (see, e.g., *People v. Price, supra,* 1 Cal.4th 324, 414; *Arnold v. Evatt* (4th Cir. 1997) 113 F.3d 1352, 1359–1360), in light of our conclusion, discussed, *post,* that the trial court's error under section 1138 in barring defendant and defense counsel from being present at the jury's return visit was prejudicial under the standard applicable to *nonconstitutional* errors, we have no occasion in this case to decide whether the error in question rises to constitutional stature.

■ We believe a few additional observations and words of caution are warranted. Defendant has not contended on appeal that, in light of the risk that a return visit to the crime scene would lead to the jurors' improper receipt of new evidence, the trial court either totally lacked authority to permit such a return visit once jury deliberations had begun or abused its discretion in permitting such a return visit under the circumstances of this case. Accordingly, we have no occasion to address either of those issues here. In view of the substantial pitfalls very likely to be posed by such a return visit, however, we believe that at the very least a trial court, in exercising its discretion with regard to such a request, should well keep in mind the potential problems illustrated by the circumstances of this case. If the court nonetheless concludes that a return visit after jury deliberations have begun is appropriate, the court, before permitting the jury to view the crime scene on the return visit, should examine the setting with counsel for all parties to afford counsel the opportunity to bring to the court's attention any change in the scene that might affect the jury's consideration of the case. Further, should any unanticipated events occur during the jury's return visit that result in the jury's receipt of new evidence, the court should be prepared to permit a reopening of the evidence so as to afford all parties the opportunity to respond to such events. Such actions may help to minimize the risk of prejudicial error in this setting.

## III

Having concluded that the trial court in this case erred under section 1138 in prohibiting both defendant and defense counsel from being present at the jury's return visit to the crime scene after deliberations had begun, we must decide whether the error was prejudicial.

In the present case, although the prosecution's evidence that Garcia murdered Gregg certainly was sufficient to support the conviction, it was not overwhelming or irrefutable. There was no eyewitness testimony to the shooting, and the prosecution presented no physical evidence directly tying Garcia to the murder. As noted, the police investigation of the crime scene failed to reveal any shoe prints, fiber evidence, or other material that directly connected Garcia to the shooting or that he even was present in the area from which the prosecution maintained the shotgun blasts were fired. The shotgun pellets recovered from Gregg's body did not match any of the shotgun shells found at Garcia's residence, and the prosecution's forensic evidence expert, who examined the two 12-gauge Remington shotguns recovered from

Garcia's residence, did not find any indication that the type of pellets used in the shooting of Gregg had been fired from either shotgun.[10]

The prosecution's case rested largely on the circumstance that Garcia and Gregg were engaged in an ongoing controversy regarding Garcia's activities on his recently purchased ranch, that Garcia had made several angry and threatening statements to and about Gregg to other persons during the ongoing controversy, and that Gregg's neighbors knew of no one else with whom Gregg had had a disagreement. The prosecution's case also was bolstered by Garcia's somewhat peculiar and arguably suspicious reaction upon being informed of Gregg's death by an acquaintance and law enforcement officers.

The testimony of prison informant Villalba regarding statements Garcia allegedly made to him while the two were together in a holding cell were potentially quite incriminating as to Garcia, but there are several reasons why the jury may not have found the informant's testimony to be credible. The jury may have concluded that the informant's testimony was dubious on its face, because it is unlikely that any defendant would have made such incriminating statements to an inmate he did not know and had just met. There was strong and extensive evidence impeaching Villalba's testimony (recited, *ante*). In addition, the jury was admonished, as required by statute, that the testimony of any in-custody informant always must be viewed "with caution and close scrutiny." (§ 1127a.) Further, the circumstance that the jury asked to inspect once more the scene of the crime indicates that the jury was not convinced of defendant's guilt or the truth of the special circumstance allegation by the informant's testimony alone. Accordingly, we do not believe it is appropriate, in determining the potential prejudice of the trial court's error, to assume that the jury gave significant weight to the informant's testimony. (See generally 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 442, p. 489, and cases cited.)

 Further, the absence of evidence of other possible assailants must be viewed from an appropriate perspective. The applicable California case law places a substantial limitation upon a defendant's introduction of evidence

---

[10] Although the prosecutor suggested in closing argument at trial (and in oral argument before this court) that a shotgun that Garcia had possessed in 1993, but that had not been found in his residence when the police searched the residence in November 1998, may have been the murder weapon, the prosecution presented no evidence to support a finding that that shotgun was the murder weapon. Although the prison informant Villalba testified that Garcia told him that the police never would find the murder weapon because he (Garcia) had gotten rid of it, as noted Villalba's credibility was thoroughly impeached.

regarding a third party's potential culpability for a charged offense. (See, e.g., *People v. Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99] ["evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime"]; *People v. Sandoval* (1992) 4 Cal.4th 155, 176–177 [14 Cal.Rptr.2d 342, 841 P.2d 862].) In light of Gregg's employment as a therapist at a mental health clinic, it is certainly conceivable that her death could have been precipitated by a work-related incident that was unknown to the witnesses who testified at trial.

To support its contention that Garcia was guilty of first degree murder and that the charged lying-in-wait special-circumstance was true, the prosecution presented evidence suggesting that Garcia lay in wait for Gregg in a hollowed-out tree or bushes in the creek bed and shot her from his hidden position. To controvert that theory, the defense presented a respected forensic expert who criticized the investigating officer's method of determining the trajectory of the fatal shotgun blasts and the probable position of the shooter, and who, on the basis of his own observations and experiments, concluded that the fatal shots most likely had been fired from an open area close to the fence from which the shooter would have been clearly visible to Gregg. Defense counsel relied heavily in closing argument on the defense expert's testimony, maintaining that this evidence suggested that the shooter most likely was someone other than Garcia—someone whom Gregg knew and with whom she was friendly and would have been comfortable conversing while working on her fence, while the other person held a shotgun. Because the prosecution had introduced evidence that Gregg had expressed reluctance to be alone with Garcia, the defense argued that it was unlikely that Gregg would have been alone with Garcia in such a setting. In addition to raising questions with regard to the identity of the shooter, the defense expert's testimony as to the probable location of the shooter also cast doubt on the lying-in-wait special-circumstance allegation as well as the lying-in-wait theory of first degree murder.

As noted, after two days of deliberation the jury requested to make a return visit to the scene of the crime. The request indicates that the jurors had at least some lingering questions concerning where the shooter was located at the time of the shotgun blasts, and whether the prosecution's version of the events should be accepted. Very shortly after the jury revisited the crime scene, it returned its verdict against Garcia.

In light of the state of the evidence and the significance that the jury apparently attached to the evidence relating to the crime scene, we conclude that the trial court's error in barring defendant and defense counsel from being present during the jury's return visit to the crime scene was prejudicial under the ordinary prejudicial error standard set forth in the California Constitution. (See Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].) Because of the trial court's ruling, defendant and defense counsel were precluded from observing the state of the crime scene at the time of the jury's return visit as well as the conduct of the jurors on that occasion, and from being present when a juror posed the inquiry relating to the use of a laser pointer and the trial court responded to that inquiry. Had defense counsel been present, counsel could have objected to the trial court's comment to the jury to "[d]o whatever sight lines you can do with whatever is down there" and to any improper experiments that one of more jurors may have conducted during the return visit. In addition, trial counsel would have been in a position to observe the manner in which the sheriff's department employees replaced the segment of the fence that included the shotgun holes prior to the jury's revisit, in order to ascertain whether the reconstruction of the fence accurately reflected the state of the crime scene at the time of the first visit, and to object to the inclusion of the dowels in the event it was not possible to ensure that the repositioning of the fence and the dowels precisely duplicated their placement at the initial jury view. Because of the apparent significance of the crime scene evidence to the jury and the potential relevance of the location of the shooter both to the issue of identity and the claim that the killing occurred while the shooter was lying in wait, we conclude there is a reasonable probability that a result more favorable to defendant would have been reached in the absence of the error committed by the trial court.[11]

---

[11] Justice Chin's concurring and dissenting opinion, after setting forth a summary of the evidence that ignores the weaknesses in the prosecution's evidence and the significant conflict in the evidence with regard to the location from which the fatal shotgun blasts were fired, declares that the evidence "point[s] exclusively to defendant as Gregg's killer" (conc. & dis. opn., *post*, at p. 810) and finds it "simply inconceivable the jury would have reached a different verdict had counsel or his client been present at the jury revisit." (*Id.* at p. 811.) In reaching these conclusions, however, the opinion fails to mention that the jury, after hearing and considering all of the evidence recounted by the concurring and dissenting opinion, deliberated for two days without reaching a verdict, and then requested to revisit the crime scene, with one juror emphasizing that it was "important" that the fence be repositioned at the scene and another juror indicating a desire to "shoot a line" at the scene. The opinion also takes no note of the circumstance that virtually the only evidence presented by the prosecution to support the lying-in-wait special circumstance was the contested evidence relating to the likely location of the shooter. For all of these reasons, we believe the analysis and conclusion of the concurring and dissenting opinion is unpersuasive.

Furthermore, the concurring and dissenting opinion also seemingly fails to recognize that its conclusion that the trial court error was not prejudicial under the California prejudicial error standard logically requires it to reach the further question whether the trial court's ruling

## IV

Accordingly, the judgment of the Court of Appeal is reversed, and the Court of Appeal is directed to remand the matter to the trial court for a new trial.

Kennard, J., Baxter, J., and Moreno, J., concurred.

**CHIN, J.,** Concurring and Dissenting.—I concur in the majority's initial holding that the trial court erred in refusing to permit a defense presence at the jury revisit of the crime scene. Generally, given the potential for confusing the jurors or exposing them to new or misleading evidence, the defendant and his or her counsel should be allowed to accompany the jury to visit or even revisit a crime scene. But only sheer speculation supports the majority's additional holding that the error was prejudicial and requires overturning defendant's murder conviction. As I explain, the evidence against defendant was *extremely strong*—and there were no other suspects. Only defendant had the proven motive, means, and opportunity to kill Deborah Gregg. Equally important, defendant fails to show how he or his counsel could have done anything significant to help the defense obtain a more favorable verdict had they been present at the jury revisit. The initial jury visit occurred nearly a year and a half after Gregg's murder, and even defense counsel admitted it was impossible satisfactorily to reconstruct the scene.

No trials are perfect—evidentiary or procedural errors are bound to occur. But the California Constitution requires us to affirm all convictions, despite such errors, in the absence of *a miscarriage of justice*, i.e., if no reasonable *probability* exists that the error affected the judgment. (See Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].) Where is the miscarriage of justice here? How *probable* is it under the facts in this case that defendant or his counsel could have obtained a more favorable verdict had they been invited to accompany the jury on its revisit of the crime scene?

The majority adequately states the facts, but here are the highlights of the strong case against defendant:

---

violated defendant's federal constitutional right to the assistance of counsel at all critical stages of a criminal proceeding, and if so, whether the error properly can be held nonprejudicial under the stringent beyond-a-reasonable-doubt prejudicial error standard that applies to federal constitutional error. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) (See, *ante*, p. 803, fn. 9.)

**1. The ongoing dispute**—Defendant had a long-standing dispute with Gregg concerning the possible encroachment of Gregg's trailer, well, and fence on his property. Despite a survey seeming to confirm Gregg's ownership of the disputed property, defendant continued to believe she was encroaching. Gregg and defendant each filed complaints against the other relating to the other's property and the uses being made of it. Gregg complained defendant was doing illegal work on the creekside property; defendant asserted Gregg's trailer and well encroached on his property, preventing him from fencing it.

Eventually, defendant sued Gregg for trespass and encroachment. The parties seemed to settle the suit amicably by selecting an agreed boundary, but Gregg filed complaints with a game warden and a state inspector regarding defendant's various activities, and the conflict heated to the point where Gregg filed a cross-complaint alleging defendant's encroachment, nuisance, trespass, and slander of title. This bitter and prolonged dispute of course provides significant evidence of defendant's motive to kill Gregg.

**2. Defendant's threats**—Defendant threatened to harm Gregg, whom he described to one witness as a "bitch." At a meeting between various landowners in the neighborhood, including Gregg and defendant, some neighbors heard defendant threaten to make Gregg "disappear," calling her his "enemy," and saying that any enemy of his regretted it. Mumaw, a construction worker, related that defendant, evidently referring to Gregg, told him a "lady in a trailer" was causing him legal problems and "they don't know who they're messing with." Snapping his fingers, defendant also told Mumaw that for $500 he "could make someone disappear like that."

Gregg was well aware of defendant's animosity toward her, once asking a neighbor to accompany her when she went to speak with him. Her cross-complaint alleged that defendant had threatened her by bragging that he "used to be a street fighter" and that "anyone who becomes my enemy will regret it."

**3. Gregg murdered while standing on defendant's property**—A week after Gregg filed her cross-complaint, sheriff's deputies found her body lying on defendant's side of the fence located on the disputed boundary that divided their properties. Gregg was killed by shotgun blasts, evidently while working on or repairing the fence. The deputies found two shotguns and scores of shotgun shells at defendant's home, although these shells were not

of the type found at the crime scene. According to inmate Villalba, defendant told him that the deputies took the wrong shotgun and "would never find the gun" used to kill Gregg because defendant "had gotten rid of it."

**4. Defendant's feigned surprise and disinterest**—Although defendant was informed of Gregg's death three days earlier, he nonetheless feigned surprise when sheriff's deputies told him that her body had been found on his own property. Also, defendant expressed no curiosity about where Gregg's body was found or how she had been killed. He later explained that such matters were of no concern to him.

**5. No other suspects**—Defendant failed to present evidence of *any other persons* who might have a motive, means, or opportunity to kill Gregg. As the majority acknowledge, "Gregg's neighbors knew of no one else with whom Gregg had had a disagreement." (Maj. opn., *ante*, at p. 805.) The majority refer to "a substantial limitation" on a defendant's right to introduce evidence of a third party's culpability (*id.* at p. 805), but certainly defendant had the right to implicate anyone linked by "direct or circumstantial evidence" to Gregg's murder. (E.g., *People v. Sandoval* (1992) 4 Cal.4th 155, 176 [14 Cal.Rptr.2d 342, 841 P.2d 862].) Yet he introduced no such evidence.

In short, no evidence was presented that anyone but defendant had the motive (the heated ongoing dispute, accompanied by threats), the means (possession of, and familiarity with, several shotguns), and the opportunity (the murder occurred on defendant's own property) to kill Gregg. Given the foregoing facts pointing exclusively to defendant as Gregg's killer, I ask again, how *probable* is it under the facts in this case that defendant or his counsel could have obtained a more favorable verdict had they been invited to accompany the jury on its revisit of the crime scene?

At the *initial* jury visit to the crime scene, defendant was not personally present, and defense counsel evidently raised no objection to the status of the scene at that time and made no requests to limit the jury's conduct or observations of the scene. What would he or his client have done differently at the jury revisit? The majority speculates that defense counsel might have objected to any "improper experiments" the jurors may have conducted, or any faulty reconstruction of the crime scene, but of course no evidence exists of any *material* experiments or scene reconstructions that might have actually prejudiced defendant.

Under the facts of this case, it is simply inconceivable the jury would have reached a different verdict had counsel or his client been present at the jury revisit. Accordingly, I would affirm the judgment.

Werdegar, J., concurred.