Filed 1/29/14  P. v. Prothro CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B243045 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA075724) |
| v. | |
| MARCELLUS PROTHRO et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eric C. Taylor, Judge.  Affirmed as modified.

Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant Marcellus Prothro.

Marcia C. Levine, under appointment by the Court of Appeal, for Defendant and Appellant Shawn Simpson.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

_____

After a three-week trial, Shawn Simpson and Marcellus Prothro were convicted of murder and attempted murder. Defendants are members of the 135 Piru gang, which at the relevant time was "at war" with the rival Barrio 13, or B13, gang. The prosecutor argued the essence of this case was as follows: "[T]wo 135 gangsters got in a car, they drove to the shot caller of the rival gang's house, they fired shots and drove away." The murder victim, Juan Llanos, was a member of Barrio 13, and was at the top of the gang hierarchy in a position known as "shot caller." Llanos was shot as he stood outside his mother's home. Llanos's cousin, Daniel Gutierrez, stood near Llanos when Llanos was shot.

Defendants raise numerous challenges to their convictions. We modify defendants' sentences, but otherwise affirm the judgment.

## FACTS

On February 8, 2008, at approximately 8:47 and 8:48 p.m., Prothro called Simpson. At approximately 9:11 p.m., Prothro drove Simpson to the house where Llanos lived. (The approximate time is based on a 911 call, which was received at 9:11 p.m.) Llanos and his cousin, Daniel Gutierrez, were each standing near opposite ends of the driveway in front of the house. Prothro drove the car to the front of the house. Simpson fired several shots from the car. Llanos died of a single gunshot wound. Police found two expended gun cartridges at the scene of the shooting. They also observed markings consistent with a bullet strike on a pillar post, near where Gutierrez was standing at the time of the shooting.

Llanos's brother, Marcos Llanos (Marcos), witnessed the shooting. Marcos identified Simpson as the shooter and remembered that Simpson wore a black hooded sweater. Marcos heard one shot and saw the car in which Simpson was a passenger speed away. Simpson bragged to his friend (and later, informant) Rufus Crowder that he murdered Llanos. Simpson told Crowder he wore a black hooded sweatshirt when he committed the murder. Simpson also told Crowder he fired three shots, then his gun jammed.

2

Like Simpson, Prothro was a member of the 135 Piru gang.  In February 2008, Prothro borrowed the car of his then girlfriend, K.G.  Although he promised K.G. he would have her car detailed, Prothro did not do so.  Instead, Prothro called K.G., telling her, "it's hot over here.  You need to come get the car."  Prothro told K.G. someone had been shot in the hood and some "bad shit happened" in her car.  When she retrieved her car, K.G. noticed someone had been sitting in the passenger seat, based on how the seat was reclined.  Prothro confided in K.G. that the "homies put somebody down" and described the "somebody" as "the Hispanics" who had previously chased them.

In March 2009, Simpson was arrested for Llanos's murder.  The day after his arrest, Simpson called Prothro.  Simpson told Prothro, "if the police ask you, blood, you don't even know me, blood.  You feel me?"  Prothro responded that Simpson did not have to tell him again and he needed to find out "who snitched."  Prothro understood he could not tell the police about Simpson, saying: "you. . . ain't gotta tell me twice . . . I already know . . . ."  Simpson repeated, "we can't be seen together blood, all that blood, you don't know me.  If the police asked you, if they take you in, none of that blood, you don't know where I was that night, none of that blood.  You feel me?"

On March 17, 2009, Prothro told a friend police had raided his house.  He said he was wanted for a murder of "some Mexicans."  Prothro was concerned that someone was "snitching" and police knew his "hood name."  Prothro explained police did not find "a burner [i.e. a gun] that was used in the murder" in his house.  Also in March 2009, Prothro asked K.G. to tell police he was never in her car.  Prothro entreated K.G. to provide him with an alibi if police questioned her on his whereabouts in early 2008.

At trial, detective Armando Martinez testified about Prothro's and Simpson's phone calls around the time of the murder.  Martinez testified that Prothro's call to Simpson pinged a cell phone tower that was just over one mile from the crime scene.  At about 9:12 p.m., Prothro called K.G.  The call pinged off a cell tower just under two miles from the crime scene.  At 9:43 p.m., Simpson called Prothro from less than a mile away from the crime scene.

3

Detective John Duncan testified as a gang expert. He testified that gang members commit crimes to enhance the gang and earn the respect of fellow gang members. Gang members feel safe in their territory. Llanos was an active member of Barrio 13. 135 Piru was Barrio 13's main rival. The two gangs were involved in a gang war, which involves substantial violence, shootings, and murders. Simpson told Duncan he was a gang member and his moniker was Little Ye. Prothro also identified himself as a gang member and reported his moniker was Belly Bell or Celly Cell. When given a hypothetical based on the facts of this case, Duncan opined the murder and attempted murder benefitted the gang. He also opined shooting Llanos would instill fear in the community and earn the respect of fellow gang members. Duncan testified that the crimes were committed in association with a criminal street gang because the two gang members were together. Duncan testified that snitching and lying were different; only the latter connoted a false statement.

Neither defendant testified. Through cross-examination and the testimony of their witnesses, defendants elicited evidence that Marcos did not identify Simpson in a photographic lineup; Marcos identified the car in which Simpson was the passenger as a Chevy Impala when K.G.'s car was a Honda Accord; the weapon used in the shooting was not recovered; the type of gun identified by Marcos differed from the type Simpson reported to Crowder; Prothro often spent time at a friend's house; Simpson was left-handed and the shooter used his right hand; and Prothro's girlfriend A.W. believed he was honest and trustworthy, but also believed it was possible for him to commit murder.

**PROCEDURE**

In an amended information, Simpson and Prothro were charged with the murder of Llanos. With respect to both counts, the information alleged Simpson personally and intentionally discharged a firearm and that a principal personally and intentionally discharged a firearm (§ 12022.53, subd. (d)). The information further alleged the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang. In the second count, Simpson and Prothro were charged with the attempted willful, deliberate, and premeditated murder of Daniel Gutierrez. The information also

4

alleged Simpson personally and intentionally discharged a firearm, and a principal personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c). A gang allegation also was alleged with respect to count 2.

A jury convicted defendants of all allegations. Jurors found the murder was of the first degree and the attempted murder was willful, deliberate and premeditated.

The court sentenced Simpson to 50 years to life for the murder and 40 years to life for the attempted murder. The court sentenced Prothro to 50 years to life for the murder and 32 years to life for the attempted murder.

## DISCUSSION

Prothro argues: *(1) the court should have upheld his Wheeler/Batson challenges*; (2) the court should have conducted an in-camera review of the wiretap; (3) the record lacks sufficient evidence to support his murder conviction and his attempted murder conviction; (4) the court erred in admitting evidence of a firearm not used in the current offense; *(5) the court erred in refusing him a midtrial continuance to secure the testimony of a defense witness*, *(6) the court erred in refusing to disclose the full contents of two jury notes; (7) the court should have granted his motion for a new trial*; (8) the gang instructions were incomplete and erroneous; (9) the court committed sentencing error; *and (10) cumulative error requires reversal*.

Simpson contends the court erred in calculating his sentence, and joins in the italicized arguments advanced by Prothro.

Respondent acknowledges sentencing error. Other than the sentencing challenges, respondent disputes each remaining contention. As noted above, we conclude Prothro's and Simpson's sentences require modification. We otherwise find no prejudicial error.

## I.     Batson/Wheeler Challenge (Prothro and Simpson)

Citing *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), defendants challenge the prosecutor's use of a peremptory challenge to dismiss an African American juror. Simpson joins in Prothro's argument. We find no error.

5

## A. Background

Prior to starting jury selection, the judge informed the potential jurors: "[I]t's important for the people in the audience to listen very carefully to what's being said. The way that I like to do this is ask these folks [the potential jurors seated in the jury box] most of the questions and then, when you [the remaining potential jurors] come up and ask you whether or not you've heard everything asked of everyone else. . . . So it's important to listen to this." Subsequently the prosecutor asked all of the jurors to listen to the questions posed to the potential jurors in the box in order to avoid repeating the questions. When a potential juror was seated in the box, the court routinely asked the juror if he or she had heard all of the questions.

When Juror No. 15 was seated in the box for voir dire, the trial court stated: "I think you walked out briefly, so I try to keep track of what I thought you might have missed . . . ." The prosecutor asked Juror No. 15 if she had left during questioning and Juror No. 15 answered affirmatively. At sidebar, the prosecutor sought to have Juror No. 15 excused for cause, arguing reversal of a conviction may be warranted when a juror exits the courtroom during voir dire. Defense counsel responded he would not challenge the verdict based on the potential juror leaving the courtroom. Defense counsel indicated it was within the court's discretion as to how to proceed. The court refused to dismiss Juror No. 15 for cause.

When the prosecutor exercised a peremptory challenge to excuse Juror No. 15, defense counsel objected, arguing: "I know that this is the first black person they kicked off. I wish I could have something to establish a pattern. It is sufficient for me to bring the motion. [¶] The record should reflect that we have only had three black jurors. One is sitting in the panel presently. One [wa]s [dismissed] for cause because she is a corrections officer. Then we have this particular one." The prosecutor responded she challenged the juror because the juror left the courtroom during voir dire. The trial court found no prima facie case of discrimination.

6

The record identifies no other jurors who left the courtroom during the questioning. One juror stated he was not paying attention during the questioning, but he was dismissed for cause on other grounds with the agreement of all counsel.

**B. Analysis**

Our Supreme Court recently explained the relevant legal principles: "Under both *People v. Wheeler, supra*, 22 Cal.3d 258, and its federal constitutional counterpart, *Batson v. Kentucky* [(1986) 476 U.S. 79], a party who believes his opponent is using peremptory challenges animated by a prohibited discriminatory purpose must first make a prima facie showing of such group bias. [Citations.] 'In order to make a prima facie showing, "a litigant must raise the issue in a timely fashion, make as complete a record as feasible, [and] establish that the persons excluded are members of a cognizable class." ' [Citation.] The objecting party must then produce evidence ' "sufficient to permit the trial judge to draw an inference that discrimination has occurred." ' [Citations.] This prima facie assessment is sometimes called 'the first stage of a *Batson* inquiry.' [Citation.]

"If the defendant succeeds in establishing a prima facie case, the burden shifts to the prosecutor to justify the challenges. [Citation.] The court then evaluates the prosecutor's responses to determine whether purposeful discrimination has been proven. At this so-called third stage of the *Batson* inquiry, the trial court often bases its decision on whether it finds the prosecutor's race-neutral explanations for exercising a peremptory challenge are credible. ' "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." ' [Citations.]

" 'Review of a trial court's denial of a *Wheeler*/*Batson* motion is deferential, examining only whether substantial evidence supports its conclusions.' [Citation.] We have explained that ' "the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the

7

prosecutor," ' that ' "these determinations of credibility and demeanor lie ' "peculiarly within a trial judge's province," ' " ' and that, thus, ' " 'in the absence of exceptional circumstances, we would defer to [the trial court].' " ' [Citations.]" (*People v. Jones* (2013) 57 Cal.4th 899, 916-917.)

Applying these principles here, defendants fail to show the trial court abused its discretion in finding no prima facie case of discrimination. The record does not support the inference that discrimination occurred. Prothro's argument that the prosecutor's reason for dismissing the juror was pretext for discrimination is not supported by any evidence. Even defense counsel acknowledged that dismissing Juror No.15 for cause was within the court's discretion when the prosecutor moved to have her dismissed. Defendants fail to demonstrate an abuse of discretion in the denial of their *Batson*/*Wheeler* motion.

## II.     Pretrial Challenge to the Wiretap (Prothro)

Following a spike in crime in 135 Piru gang territory, police wiretapped phone calls of 135 Piru gang members from sometime in 2008 to sometime in 2009. The wiretap was judicially approved. Before trial, Prothro challenged the wiretap. Prothro's counsel argued that after the wiretap was in place, a prosecution informant was incriminated in an unrelated murder. Prothro's counsel asserted the trial court should review the propriety of the wiretap order permitting the wiretapping of Prothro's phone because the informant was implicated in a murder. On appeal, Prothro contends the court erred in failing to conduct an in-camera review of the wiretap which allowed officers to record his phone calls.

Prothro demonstrates no basis for review of the wiretap affidavit. Although he cites authority holding that in-camera review is appropriate where there are allegations of police misrepresentation, he identifies no such police misrepresentation occurring in this case. (See e.g. *People v. Galland* (2008) 45 Cal.4th 354, 364.) The record indicates the wiretap was based on a spike in crime in territory claimed by the 135 Piru gang, not on the informant's statement to officers. Prothro therefore fails to show the informant's criminal record compelled the trial court to review the wiretap affidavit.

8

**III.    Sufficiency of the Evidence (Prothro)**

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" '  [Citation.]"  (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

**A.  Murder of Llanos**

Ample evidence supported Prothro's murder conviction.  The evidence established that prior to the murder, Prothro and Simpson spoke on the phone.  Prothro borrowed K.G.'s car to use during the shooting.  Prothro pulled up the car in front of Llanos's house, demonstrating his intent to aid Simpson in shooting Llanos.  Prothro called K.G. immediately after the shooting to return the car.  He later asked K.G. to provide him with an alibi, explaining that some "bad shit happened" in the car.  Prothro did not identify Llanos by name to K.G. but reported to her that his "homies" had murdered the "Hispanics" who had chased them.  After he was arrested for Llanos's murder, Simpson called Prothro and warned him to pretend he did not know Simpson.  From this evidence reasonable jurors could infer that Prothro borrowed K.G.'s car to drive Simpson to Llanos's location, then rapidly returned the car after the shooting to avoid detection. Reasonable jurors could infer that Prothro was Simpson's driver.

**B.  Attempted Murder Gutierrez**

Similarly, we conclude substantial evidence supported the attempted murder conviction.  Attempted murder is a specific intent crime and requires " 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' "  (*People v. Smith, supra,* 37 Cal.4th at p. 739.)  Prothro was convicted

of attempted murder as an aider an abetter.[1]  To be an aider and abettor, the defendant must have acted "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560, italics omitted.)  "When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' "[2]  (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

As noted above, Prothro drove the car and pulled up in front of Llanos's mother's house.  Llanos was standing near one side of the driveway; Gutierrez was standing near the other side.  The eyewitness to the crime, Marcos Llanos, described the two men as being approximately "eight feet away."  Marcos testified he heard a vehicle approaching.

---

[1]     The prosecutor argued:  "These two defendants were not just going to the market and, lo and behold, Mr. Simpson pulls out a gun and kills Coco [Llanos].  Mr. Prothro specifically pulled that car into the red zone, up alongside Coco's house so that Mr. Simpson could fire off those shots.  That's how you know he was in on it.  That's how you know he was an aider and abettor.  That's how you know that he shared Mr. Simpson's intent."

[2]     Under the instructions given, Prothro could be guilty for the attempted murder of Gutierrez if he knew "of the perpetrator's unlawful purpose and he or she specifically intend[ed] to and d[id] in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

The instruction given on the kill zone was as follows:  "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.'  In order to convict the defendant of the attempted murder of Daniel Gutierrez, the People must prove that the defendant not only intended to kill Juan Llanos but also either intended to kill Daniel Gutierrez, or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill Daniel Gutierrez or intended to kill Juan Llanos by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Daniel Gutierrez."

He saw a car approach and an arm holding a gun extended out of the window. He yelled to Llanos to watch out as he dove to the ground.

Police found two expended gun cartridges at the scene of the shooting. They also observed markings on a pillar post, south of the driveway, that were consistent with a bullet strike, next to where Gutierrez had been standing. According to informant Crowder's testimony, Simpson said he fired three shots, then his gun jammed.

There was also evidence that when Prothro spoke to K.G. after the shooting, he told her "the homies put somebody down." She asked, "you mean, somebody got murked [killed]?" Prothro responded: "Yes. I believe it was the Hispanics that chased us." According to this testimony, Prothro referred to "Hispanics" plural, even though only Llanos was shot. Similarly, in a recorded call with an unidentified male, Prothro said the police wanted information on "some other shit." The other person said: "What a shooting or something?" Prothro answered: "Yeah, a murder." The other person asked "Who?" Prothro answered: "Some Mexicans. . . . From up over there, you know?" Again, Prothro referred to multiple victims, even though only Llanos was shot.

There was also evidence of an ongoing gang war between Prothro's gang and the B13 gang to which Llanos belonged. The gang expert testified a gang war was characterized by shootings and murders.

This evidence taken together was sufficient to allow the jury to conclude Prothro had the requisite intent to support a conviction for the attempted murder of Gutierrez on an aiding and abetting theory, either directly, or based on a kill-zone theory. The evidence suggesting Simpson and Prothro targeted Llanos specifically was his important position in the B13 gang, and the fact that he was shot and killed. But there was also evidence from which the jury could reasonably infer Simpson and Prothro intended to kill more people than Llanos alone. K.G. testified that days or weeks before the shooting, she and Prothro were chased by people while driving. She did not recall how many people were in the other car, but she consistently referred to multiple Hispanic males. There was evidence Simpson fired three bullets, and a reasonable inference is that he would have fired more had his gun not jammed. In describing the shooting to others, Prothro referred

11

to "Hispanics" and "Mexicans." Even though only Llanos was shot in the attack, the jury could reasonably infer Prothro's references to multiple victims indicated Simpson's and Prothro's intent was to kill Llanos *and* Gutierrez, or Llanos and any other Hispanic male with him. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5 [presence at the crime scene, companionship, and conduct before and after the offense are relevant factors in determining aiding and abetting].)

Similarly, the evidence supported Prothro's conviction for attempted murder of Gutierrez based on a kill zone theory. A kill zone theory will apply " 'where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the "kill zone") as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm.' [Citation.]" (*People v. Leon* (2010) 181 Cal.App.4th 452, 466.) Thus, in *People v. Bland* (2002) 28 Cal.4th 313, 331, the court concluded the defendant could be found guilty of attempted murder on a kill zone theory where the "defendant and his cohort fired a flurry of bullets at [a] fleeing car" which had multiple occupants. (*Id*. at p. 331.)

In this case, the jury had evidence to find Simpson fired three bullets and would have fired more had his gun not jammed. There was also evidence of a bullet strike on a post next to where Gutierrez stood, suggesting Simpson aimed in directions other than directly at Llanos. The jury could credit this evidence and conclude that, absent the gun jamming, Simpson planned to unleash a "flurry of bullets," with the intent to kill not only Llanos, but also Gutierrez, who was standing near him.

To the extent the jury concluded Prothro shared Simpson's intent to kill Llanos, it could equally find Prothro shared Simpson's intent to kill those standing near Llanos. There was an ongoing gang war between Prothro's gang and the B13 gang. Prothro was chased by unknown Hispanic persons shortly before the shooting. He drove Simpson to Llanos's house. He subsequently described the attack as a shooting of multiple Hispanic persons. The method of the shooting—a drive-by shooting in which three bullets were

12

fired at two people standing relatively close to one another, and in which more bullets would have been fired without a gun malfunction, and Prothro's description of the murder which suggested his focus was on more than one Hispanic person, all provided the jury a basis to conclude Prothro shared Simpson's specific intent to kill Gutierrez.

## IV.    Admission of Evidence of Firearm Possession  (Prothro)

K.G. testified that in the summer of 2008, several months after the murder of Llanos, she saw Prothro with a shotgun.  A.W. also testified that she saw Prothro with a shotgun in 2008.  A.W. told police Prothro "kind of said he was using [the shotgun] for protection."  The prosecutor acknowledged the shotgun was not the murder weapon, but argued it was relevant to corroborate Crowder's testimony that the 135 gang was nervous about retaliation after Llanos's murder.  She asserted the evidence would also show Prothro was in fear of retaliation, either because he was a 135 gang member, or because he was a perpetrator in the murder of Llanos.  At trial, Crowder did in fact testify that at a party he attended where 135 gang members were present, including Simpson, the attendees were "on alert" about retaliation from the B13 gang.

We find no abuse of discretion in the trial court's ruling admitting the evidence as relevant.  Relevant evidence is defined as "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)  The shotgun evidence was relevant because it tended to corroborate Crowder's testimony that the 135 gang was "on alert" for retaliation from the B13 gang due to Llanos's murder, and further suggested Prothro personally was "on alert."

Moreover, even had the trial court erred in admitting the evidence, we would find Prothro has not demonstrated any prejudice.  The shotgun evidence did not tend to show Prothro was the driver or to place Prothro at the scene of the murder.  Given the strong evidence that Prothro drove Simpson to the murder scene, and was an active participant in the murder and attempted murder, it is not reasonably probable that the admission of

13

evidence Prothro possessed a shotgun prejudiced him.[3]  (See *People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [evidentiary errors in violation of state rules of evidence evaluated under the standard of prejudice announced in *People v. Watson* (1956) 46 Cal.2d 818, 836].)

## V.    Denial of a Continuance (Prothro and Simpson)

Prothro and Simpson argue their convictions must be reversed because the court improperly refused Prothro's counsel's request for a midtrial continuance to secure the testimony of an expert on cell phones.

### A.  Background

Jury selection commenced July 13, 2011.  The court was scheduled to be dark August 9 thru August 22. On August 1st, the prosecution rested.  Prothro's counsel indicated she had one witness for the afternoon of the 1st and had witnesses lined up for the following day.  The court warned counsel she needed to ensure there would be no breaks in trial.  The court stated:  "If we have a break and it's a significant break, you're going to rest.  So you need to get your folks in line."

On August 2nd, at about 2:30, Prothro decided not to call his gang expert and had no remaining witnesses scheduled for that afternoon, but had one witness scheduled for the following morning.  Prothro's counsel requested a continuance to 10:00 a.m. Counsel's offer of proof indicated the scheduled witness would contradict detective Martinez's testimony concerning cell phone towers.  Prothro's counsel represented the scheduled expert would discuss whether one could determine a person's location based on a cell phone call.  In conjunction with Prothro's motion for a new trial, the expert provided a declaration which included the following conclusion:  "[I]t appeared from the Government's own findings that the defendant [Prothro] was using a cellular tower several miles away from the crime scene just 60-seconds after the incident, and was last

---

**3**      On appeal, Prothro contends the trial court should have excluded the evidence under Evidence Code section 352.  Defense counsel did not raise section 352 in the trial court.  But even had this objection been preserved, we would still find no reversible error for the reasons explained above.

using equipment within the vicinity of the crime scene a full 20 minutes before the crime occurred." The expert concluded the cell phone evidence was exculpatory.

### B. Analysis

" ' "The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in a reversal of a judgment of conviction." ' [Citations.] Entitlement to a midtrial continuance requires the defendant 'show he exercised due diligence in preparing for trial.' [Citation.]" (*People v. Fudge, supra,* 7 Cal.4th at pp. 1105-1106.)

We need not decide whether the trial court erred in denying the defense request for a continuance because even if the ruling was in error, neither Prothro nor Simpson demonstrate prejudice. With respect to Prothro, Martinez's testimony about cell towers was relevant, but it was not the key testimony implicating Prothro. The prosecutor argued that based on Martinez's testimony, "we know that about 20 minutes before the murder takes place Mr. Prothro's cell phone pinged off of tower 508," which is about a mile from the crime scene. That is consistent with the defense expert's declaration that Prothro was in the vicinity of the crime scene 20 minutes before the crime.

The prosecutor also argued: "Now, I want to be clear to you, cell phone evidence, [is] not a GPS device. . . . Nobody is saying that Mr. Prothro was definitely at this place at this time based on the cell evidence. This is just to give you an idea of the general area that he is within. [¶] If the cell phone can ping off this tower, then clearly he is not in New York . . . ." Thus, the prosecutor's argument was consistent with the defense

15

expert's proposed testimony.[4] Therefore, Prothro fails to demonstrate he suffered prejudice.

Simpson also fails to demonstrate prejudice. As Simpson's counsel argued, the key evidence against him was Marcos's identification of him and Simpson's admission to Crowder.[5] The cell phone evidence neither bolstered nor undermined the evidence implicating Simpson. A continuance to call Prothro's expert would not have affected the outcome with respect to Simpson.

## VI. Jury Notes (Prothro and Simpson)

Prothro and Simpson argue the court prejudicially erred in refusing to disclose two juror notes to them. We conclude any error was not prejudicial.

### A. Background

During deliberations, jurors sent the court a note stating: "We are currently having a misunderstanding on our decisions. 11-1. [¶] Juror #7 would like a word with the judge regarding decision."

The court responded as follows: "The attorneys are being called. Please continue to deliberate, and reveal to no one how you are split. I cannot simply talk to individual jurors regarding your decision before it is made. What is the nature of the problem, and what can the court do to help you."

---

[4] Similarly, we reject Prothro's claim of ineffective assistance of counsel based on his counsel's failure to secure the expert's testimony on August 2. Even if counsel's performance was deficient, we would not find Prothro has established it is reasonably probable a more favorable result would have resulted in the absence of counsel's failings. (*People v. Lewis* (1990) 50 Cal.3d 262, 288.)

[5] Simpson's counsel argued: "The case against Shawn Simpson essentially rests upon the testimony of two individuals. Those individuals are Marcos Llanos and Rufus Crowder."

16

The court did not share the complete contents of this note with counsel. The court described the note as a request from one or more jurors to talk to the court.

About fifteen minutes later, the court received the following note: "foreperson stated that no evidence of a murder committed by Simpson & Prothro. [¶] Phone calls – 'especially the call' [¶] maps 'nothing register for me' The car – Llanos stated 'it was an impalla' [¶] The line up. [¶] Absolutely decided (told us) before coming into the jury room. Would not even discuss reasons for her decision was quite adamant & very arrogant 'already saw everything.' "

The court did not share the complete content of this note with counsel. Instead, the court explained the gist of the note was that some jurors "aren't willing to deliberate." Counsel for Simpson requested the court reread CALCRIM No. 3550. The prosecutor requested the court also ask jurors if a juror was refusing to deliberate; counsel for Prothro objected to that request. Prothro's counsel argued that reinstructing the jury with CALCRIM No. 3550 was sufficient.

The court responded to the jurors: "Please review and follow Instruction #3550. Please advise the court of anything I can provide to assist you." Instruction No. 3550 stated in pertinent part: "It is your duty to talk with one another and to deliberate in the jury room. You should try to agree on a verdict if you can. Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors. Do not hesitate to change your mind if you become convinced that you are wrong. But do not change your mind just because other jurors disagree with you. [¶] Keep an open mind and openly exchange your thoughts and ideas about this case. Stating your opinions too strongly at the beginning or immediately announcing how you plan to vote may interfere with an open discussion. Please treat one another courteously. Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other."

Prothro argues he suffered prejudice from the court's refusal to divulge the contents of the jury notes because "[c]ounsel had no opportunity to seek inquiries into a deadlock or misconduct warranting motions for mistrial. But most important, they had no opportunity to request further readbacks or at least clarification if this is what was

17

being requested."  Prothro also argues the trial court's reference to instruction number 3550 was "coercive of a verdict on the part of the foreperson. . . ."  According to Prothro, if counsel had been aware of the note, counsel could have requested an instruction that reminded all jurors including those in the majority and the minority of their obligation to deliberate.  Simpson joins in the argument.

### B.  Analysis

First, requesting that jurors follow instruction 3550 was not coercive.  To analyze coercion, " '[t]he basic question . . . is whether the remarks of the court, viewed in the totality of applicable circumstances, operate to displace the independent judgment of the jury in favor of considerations of compromise and expediency. . . .'  [Citations.]" (*People v. Santiago* (2009) 178 Cal.App.4th 1471, 1476.)  Here, jurors were simply reminded of a standard instruction previously given by the trial court.  The court did not express its view of the evidence or suggest jurors should reach a guilty verdict.  Nor did the court urge the jurors to reach a verdict.  The instruction requires each juror to deliberate, not only jurors in the minority.  The record does not support the assertion that the court pressured the foreperson to change his or her verdict.

A defendant and his counsel are "entitled to be timely informed of [any questions that may be posed by the jury] and to be provided an adequate opportunity to participate in the court's determination of the proper response." (*People v. Garcia* (2005) 36 Cal.4th 777, 802-803.)  Penal Code section 1138 (section 1138) states, in pertinent part, that when a deliberating jury disagrees "as to the testimony, or if they desire to be informed on any point of law arising in the case," the trial court must provide the required information "in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called.  Although the language of section 1138 refers to notice, the statute has been interpreted to afford the defense the right "to be present and to have an opportunity to have meaningful input into the court's response to the jury's inquiry." (*Garcia, supra*, at p. 802.)  "[T]he procedural safeguards embodied in section 1138 recognize that both defense counsel and prosecuting attorneys frequently [] play a crucial role" when a deliberating jury seeks information. (*People v.*

18

*Garcia, supra,* 36 Cal.4th at p. 802; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 1028 ["Counsel should be notified in order to ensure that counsel has an opportunity to object to the course of action undertaken by the court or suggest an alternative course but the primary goal served by section 1138 is to provide the jury with the evidence it needs for its deliberations."].)

We need not decide whether the trial court must always read the entirety of a jury's note to counsel because, in this case, neither Prothro nor Simpson demonstrate prejudice from the failure to provide the complete notes to counsel. (See *People v. Frye* (1998) 18 Cal.4th 894, 1007-1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Although Prothro suggests with the benefit of the notes his counsel could have requested an instruction requiring *all* jurors to deliberate, that is what the court instructed the jurors to do. Specifically, the court instructed the jurors: "Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors. Do not hesitate to change your mind if you become convinced that you are wrong. But do not change your mind just because other jurors disagree with you." Under this instruction, jurors were told not to change their mind simply because other jurors disagreed, and all jurors were instructed to deliberate. Prothro fails to identify any prejudice from the court's refusal to read the entire note. Simpson likewise identifies no prejudice allegedly suffered from the court's refusal to provide the complete text of the juror notes, and we find none.

## VII. Prothro's Motion for New Trial (Prothro and Simpson)

Prothro argues the court erred in denying his motion for a new trial based on prosecutorial misconduct, the absence of foundation for Martinez's testimony concerning cell phone towers, and ineffective assistance of counsel. Simpson purports to join in the arguments except for the ineffectiveness argument, but fails to show how the argument is relevant to him, or any prejudice allegedly flowing to him from the claimed errors.

19

### A. Alleged Prosecutorial Misconduct

During rebuttal, the prosecutor argued: "Mr. Brown argued that how do we know Mr. Prothro is the shooter because nobody is saying specifically that he is the shooter? Well, there is somebody – excuse me – the driver. I apologize. I misspoke. We do know that Mr. Prothro is the driver by process of elimination. We know there's a driver and a shooter in this drive-by. Both counsel agreed on how this drive-by took place. They didn't argue that. There's no evidence that anybody else was there." [¶] You know that that someone is driving the car because how does the car get there and get away. *Mr. Prothro has been identified as the driver by Marcos, by Mr. Crowder.* So we know that Mr. Prothro is the driver." (Italics added.)

The prosecutor misspoke when she stated that Prothro was identified as the driver by Marcos and Crowder. Marcos and Crowder identified Simpson, not Prothro. No objection was interposed.

Prothro forfeited his argument of prosecutorial misconduct by failing to raise it at the time the prosecutor made the misstatement, and by failing to request a curative instruction. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1210; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 561.) With an objection, the prosecutor easily could have corrected her obvious misstatement. Assuming the questionable proposition that the failure to object constituted deficient performance, Prothro fails to demonstrate any prejudice. Immediately before the misstatement, the prosecutor clarified that no one identified Prothro. Earlier, the prosecutor argued jurors had to rely on circumstantial evidence to convict Prothro, but could rely on direct evidence to convict Simpson. When the argument is considered as a whole, jurors could not have been misled into believing Marcos and Crowder identified Prothro. Moreover, in addition to argument, the testimony at trial made clear that Marcos did not identify Prothro. Crowder testified he did not know whether Prothro was the driver. Finally, although Simpson purports to join in this argument, he identifies no prejudice to him from the failure to object to the prosecutor's argument and we find none.

20

### B. Foundation for Martinez's Testimony

Prothro argues detective Martinez's testimony lacked adequate foundation. Prothro asserts Martinez's experience "was no substitute for specialized foundation in expertise or data for such specific testimony regarding this cluster of towers."

#### 1. Background

Martinez testified that he received training from Verizon. Martinez took a class in how to analyze various issues relating to cell phones. When Martinez was asked whether "he heard the principle of 'the closest tower, the stronger signal,' " Simpson's counsel objected. Over objection, Martinez testified: "When your phone is off and it's not – you're not making any phone calls, it's in your pocket, the telephone is racking and stacking. So basically it communicates with the cell towers that are near the telephone. It can communicate with two or three different cell towers. [¶] That data is not recorded. So it racks and stacks, so that when you're ready to make a phone call, it automatically grabs the nearest cell tower with the strongest signal." Counsel for Prothro objected.

The court requested the prosecutor lay further foundation. Martinez testified that he spoke to technicians and analysts from various phone companies. Martinez testified that, in his experience, where the cell site places the caller can be, and is, corroborated with other evidence.

When the prosecutor asked about the general range of a cell tower, Prothro's counsel objected. Over objection, Martinez testified he spoke to technicians, and analysts, and representatives at Verizon about the coverage for the different towers. Martinez testified the general range is a half a mile to two and a half miles. Martinez personally went to the cell site locations to verify the address of the towers.

#### 2. Analysis

Even if the court erred in allowing Martinez to testify regarding cell phone towers, which we do not decide, neither Prothro nor Simpson demonstrates prejudice. As previously noted, Martinez's testimony was not the key testimony implicating Prothro or Simpson. The key evidence against Prothro was the evidence that he borrowed K.G.'s car, called her shortly after the murder to return the vehicle, and informed her that "bad

21

shit" happened in her car. Prothro also asked K.G. for an alibi and understood Simpson's reference when Simpson warned Prothro to stay away from him the day after Simpson was arrested for Llanos's murder. Although Prothro correctly describes this evidence as circumstantial, it is strong evidence that Prothro drove Simpson to kill Llanos and Gutierrez. Had the court excluded Martinez's testimony it is not reasonably probable Prothro would have received a more favorable verdict.

Simpson also fails to show any prejudice. With respect to Simpson, the key evidence was Marcos's identification and Crowder's summary of Simpson's confession. Martinez's testimony had no bearing on this evidence and the admission of Martinez's testimony did not prejudice Simpson. (See *People v. Fudge*, *supra*, 7 Cal.4th at p. 1103 [state standard of prejudice applies to evidentiary errors in violation of state rules of evidence].)

### 3. Alleged Ineffective Assistance of Counsel

Prothro argues his counsel rendered ineffective assistance because she counseled him not to testify. On this record Prothro demonstrates no ineffective assistance of counsel. Without knowing what Prothro's testimony would have been, Prothro's argument that the outcome would have been different if he had testified lacks merit. (*People v. Williams* (2013) 218 Cal.App.4th 1038, 1074 [to prevail on claim of ineffective assistance of counsel defendant must show prejudice].)

## VIII. Alleged Instructional Error (Prothro and Simpson)

### A. No Further Definition Required

Relying on Justice Werdegar's concurring and dissenting opinion in *People v. Albillar* (2010) 51 Cal.4th 47, 73 (*Albillar*), Prothro argues the trial court should have sua sponte instructed the jurors on the meaning of the term "in association with a criminal street gang." *Albillar* does not support Prothro's argument.

In *Albillar*, the majority held there was sufficient evidence that sex offenses were committed in association with the gang because the "defendants relied on their common gang membership and the apparatus of the gang in committing the sex offenses . . . ." (*Id*. at p. 60.) In her separate opinion, Justice Werdegar found the record lacked

22

sufficient evidence to show the defendants acted in association with a gang and questioned the majority's analysis. (*Id.* at p. 73.)

Neither the majority nor Justice Werdegar held that the phrase "in association with" was a technical phrase that required definition. *Albillar* does not support Prothro's argument that the court was required to sua sponte define the phrase "in association with any criminal street gang." Instead, the *Albillar* court simply explained why sufficient evidence supported the gang enhancement. The high court relied on evidence demonstrating common gang membership and the apparatus of the gang in committing the offenses as factors showing substantial evidence, but did not require those factors in every case.

Even if the court should have instructed the jurors that "in association with the gang" means defendants rely on their common gang membership and the apparatus of the gang in committing the offense, the only reasonable conclusion in this case is that defendants acted in association with the gang. Defendants were self-admitted members of the 135 Piru gang. At the relevant time, the 135 Piru gang was at war with the B13 gang. Together Simpson and Prothro committed a shooting at a rival gang member's house. Simpson then bragged about killing Llanos. Prothro reported that his "homies" "put . . . down" the Hispanic persons who had chased him. We reject defendants' argument.

**B. Defendants Demonstrate No Other Instructional Error**

Prothro argues the following instruction was erroneous: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged; OR [¶] The defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to

23

commit crime." Prothro failed to request any modification to the instruction, fails to show it is erroneous, and fails to show prejudice. Although Simpson purports to join in the argument he demonstrates no error and identifies no prejudice.

Finally, Prothro also challenges the standard instruction on expert witness testimony. He argues that under the instruction, jurors could consider the hearsay and anecdotes of the gang expert.[6] Simpson joins in these challenges to the court's instructions. But, neither Prothro nor Simpson identify specific hearsay testimony or anecdotes they contend the jurors should not have been allowed to consider. Neither demonstrates error in the instruction, a deprivation of due process, or prejudice from the instruction, which was not challenged in the trial court. Even assuming that defendants demonstrated error, they demonstrated no prejudice under any standard.

## IX.    Prothro's Sentence (Prothro)

Prothro argues the firearm enhancement on the attempted murder count must be reversed because it was neither alleged, nor presented to the jury for a finding. The People agree, as do we. A gun enhancement pursuant to section 12022.53, subdivisions (d) and (e)(1) was not alleged or sought at trial as to the attempted murder count. In addition, Gutierrez did not suffer death or great bodily injury. The trial court

---

[6]    The expert witness testimony instruction (CALCRIM No. 332) provides: "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence. [¶] An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion."

had no authority to impose the enhancement at sentencing. (*People v. Botello* (2010) 183 Cal.App.4th 1014, 1026-1029.) Prothro's sentence must therefore be reduced by 25 years to life. However, as the People point out, the trial court imposed a seven-years-to-life sentence on the attempted premeditated murder count, which was unauthorized. Pursuant to section 186.22, subdivision (b)(5), the trial court should have imposed a sentence of life with a minimum of 15 years. (*People v. Campos* (2011) 196 Cal.App.4th 438, 447-454.)

## X.     Simpson's Sentence (Simpson)

Simpson argues his sentence of 15 years to life for attempted murder is unauthorized. He also contends the court improperly sentenced him under section 12022.53, subdivision (d), when he was charged under section 12022.53, subdivision (c). We agree with the latter contention only.

Although the sentence for attempted murder with deliberation and premeditation generally is life with the possibility of parole, in this case Simpson also was convicted of the gang enhancement under section 186.22, subdivision (b)(5). That enhancement set a minimum parole eligibility date of 15 years. Therefore, the trial court correctly sentenced Simpson to 15 years to life.

The court however erred in sentencing Simpson to an uncharged enhancement. As respondent acknowledges, Simpson's sentence must be corrected to reflect the enhancement for which Simpson was charged and convicted. Section 12022.53, subdivision(c) provides: "Notwithstanding any other provision of law, any person who, in the commission of a [specified] felony . . . personally and intentionally discharges a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 20 years." Under this statue, Simpson should have been sentenced to 20 years.

## XI.  Cumulative Error (Prothro and Simpson)

Defendants argue that cumulative error requires reversal. Having reviewed the entire record, we find no cumulative error requiring reversal.

## DISPOSITION

With respect to Simpson, the judgment is modified to reflect a 20-year sentence on Count 2 (attempted murder) for the section 12022.53, subdivision (c) enhancement. With respect to Prothro, the judgment is modified to reflect a 15 years to life sentence on Count 2 (attempted murder).  The clerk of the trial court is directed to prepare amended abstracts of judgment reflecting these modifications and send certified copies to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


BIGELOW, P. J.


We concur:


FLIER, J.


GRIMES, J.

26